# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

REBECA SANTIAGO,
    Plaintiff,

    vs.

MEYER TOOL, INC.,
    Defendant.

Case No. 1:19-cv-32
Dlott, J.
Litkovitz, M.J.

**ORDER**

    This matter is before Court on plaintiff's request to take the deposition of Doug Lang, the President of Meyer Tool, Inc., and defendant Meyer Tool's request to limit the scope of Mr. Lang's deposition. The Court previously ordered plaintiff to state her basis for wanting to depose Mr. Lang, including why she believes his testimony is relevant the claims in this case. (Doc. 57). The Court also ordered defendant to respond to plaintiff's submission by December 18, 2019.[1] (Doc. 57).

    The scope of discovery extends to nonprivileged information that is relevant to any party's claim or defense, regardless of whether the information sought is admissible, that is "proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). Plaintiff alleges, inter alia, claims of gender and disability discrimination, gender pay discrimination, and violation of the Family and Medical Leave Act, 29 U.S.C. § 2601. The Court has reviewed the parties' submissions and finds that the testimony of Mr. Lang is relevant to plaintiff's claims. Previous deposition testimony in this matter indicates that Mr. Lang was the final decision-maker on plaintiff's termination. He was required to approve or disapprove the action recommended by plaintiff's supervisor, and plaintiff may inquire as to Mr. Lang's reasons for approving the termination. In addition, there is testimony that Mr. Lang was responsible for approving Meyer

---

[1] The parties' email submissions are attached hereto.

Tool's Performance and Training Policy in place at the time plaintiff was terminated from her employment with Meyer Tool and for approving any proposed pay raises of Meyer Tool employees. Plaintiff has identified several areas in which Mr. Lang may have direct knowledge concerning the claims in this lawsuit, and there is no intimation that plaintiff's request for Mr. Lang's testimony is for an improper purpose or harassment. In addition, it does not appear that the deposition of Mr. Lang would impose an undue burden on defendant. Plaintiff has shown that Mr. Lang's testimony is relevant to the claims in this case, and the discovery sought by plaintiff appears to be proportional to the needs of the case. The Court declines to set limits on the scope of Mr. Lang's deposition given plaintiff's showing of relevancy to the gender and disability harassment claims pled in this case.

**IT IS SO ORDERED.**

Date: 12/20/2019

Karen L. Litkovitz
United States Magistrate Judge

Natalie F. Grubb
Mark E. Owens

# Grubb & Associates, LPA

*Attorneys and Counselors at Law*
**437 W. Lafayette Road, Suite 260-A**
**Medina, Ohio 44256**

Employment, Labor &
Corporate Law
Commercial & Civil Litigation
Workers Compensation
Personal Injury
Family & Juvenile Law

PH: (330) 725-7252
FAX: (330) 723-1095
E-Mail: officemgr@grubbandassoc.com

**www.grubbandassoc.com**

**SENT VIA E-MAIL TO:** litkovitz_chambers@ohsd.uscourts.gov; JGreiner@Graydon.law; NZiepfel@Graydon.law

December 13, 2019

Magistrate Judge Karen L. Litkovitz.
Potter Stewart U.S. Courthouse, Room 716
100 East Fifth Street
Cincinnati, OH 45202

> *Re: Santiago v. Meyer Tool Incorporated, Case No.* 1:19-cv-00032-SJD-KLL

Dear Magistrate Litkovitz:

Pursuant to your Order of December 11, 2019, Plaintiff respectfully submits this statement of explanation for the need for Plaintiff to take the deposition of the President of Defendant, Meyer Tool Incorporated ("Meyer Tool"), Doug Lang. The deposition testimony of Meyer witnesses to date consistently establishes that Doug Lang was directly involved in the setting of employee raises and employee discipline and terminations, including the termination of Plaintiff.

On November 15, 2019, Plaintiff began, but was unable to finish, the deposition of Deanna Adams, HR Director for Meyer Tool. Ms. Adams reports directly to Mr. Lang. Ms. Adams testified that Mr. Lang discusses all employee terminations with her or she discusses them with him. She discussed the termination of Plaintiff with Mr. Lang. Beau Easton, Vice President of Meyer, does not have any involvement with employee terminations unless he is a committee member and /or approves the committee recommendation as one of the three members of an investigative committee relative to an employee complaint of harassment.

On November 13, 2019, Plaintiff took the deposition of Meyer Tools' former V.P. of Operations, Gordon ("Gordy") McGuire, who retired on December 31, 2018. Mr. McGuire, consistent with the testimony of Ms. Adams, testified that Mr. Lang had the final say as to all employee disciplinary / corrective actions. Mr. McGuire sat on two, three person investigative committees that interviewed witnesses and made recommendations to the President (Mr. Lang) regarding specific employee complaints of sexual harassment. Mr. Lang decided who would be appointed to serve on an investigative committee. Mr. McGuire further testified that Mr. Lang approved Meyer Tool's Performance and Training Policy, which was in place at the time of Plaintiff's termination on the purported basis of poor work performance and attendance.

Mr. McGuire testified that Mr. Lang approves the annual cost of living adjustment ("COLA") percentage increase in employee compensation and approves all employee pay raises. Each supervisor would annually be given a stack of folders, one folder for each employee reporting to him, which would include the COLA rate for that year. Mr. McGuire testified that the supervisor would then have discretion to give a higher raise based on merit. Mr. McGuire would sign off and pass the folders to Payroll and Accounting, which would then obtain ultimate approval for the pay raises from Mr. Lang.

The ability to take an unlimited discovery deposition of Mr. Lang is critical to Plaintiff's case, as her claims against Meyer Tool include gender based pay discrimination, as well as gender and disability harassment, including hostile work environment discrimination. See counts set forth in *First Amended Complaint*.

Attached hereto for your reference is a pay approval form for employee Huck Finn (Bates No. MEO1244) (Exhibit A). Also attached is an email from Christine Steele in HR to Mr. Lang on October 9, 2015, referencing an investigative committee's recommendations to Mr. Lang regarding an employee sexual harassment claim (Bates No. MEO1918) (Exhibit B), and an investigative committee's recommendations to Mr. Lang regarding another employee complaint of sexual harassment by supervisor Huck Finn (Bates No. MEO1465) (Exhibit C). From the case of *William Cannon-El v. Meyer Tool Incorporated*, S.D. Ohio Case No. 1:16cv956, also in this Court, Plaintiff attaches portions of the transcript of Nicole Fugate, confirming Mr. Lang's involvement with and ultimate approval of committee recommendations for employee discipline arising from harassment complaints (Exhibit D). Deposition Exhibits 60 and 62 from Ms. Fugate's deposition are also attached (Exhibits E and F). Relevant portions of the Transcript of the February 17, 2017 deposition of Paul Rowland, Plant Manager, in the *Cannon-El* case are attached (Exhibit G), as well as a page from the January 20, 2017, deposition of Ms. Adams in the *Cannon-El* case, confirming that Ms. Adams reports directly to Mr. Lang (Exhibit H).

Very Truly Yours,

GRUBB & ASSOCIATES, LPA

*/s/ Mark E. Owens*
Mark E. Owens, Esq.

cc:    John C. Greiner, Esq.
       Nicholas J. Ziepfel, Esq.

       File Copy
       Client Copy

| New Hire | Information | Status | #00004 8/12/1985 |
|---|---|---|---|
| Name: | Huck Finn | 10 | |
| Requisition # | 200101215 | 10 | |
| Approval of Requisition | ATE/DL | 10 | |
| Job Description | Asst Supervisor | 10 | |
| Supervisor: | Gordy McGuire | 10 | |
| Department: | 200 | 10 | |
| Shift: | Nights | 10 | |
| Location: | HQ | 10 | |
| Background: | x | | |
| Physical/Drug Screening : | x | | |
| HS/Equivalent | x | | |
| Pending start date: | 4/11/2016 | 10 | |
| Starting rate of pay | $36.55 | 10 | |
| Approval Date | 4/8/2016 | 10 | |
| Senior Management | Doug Lang | 10 | |
| Management Comments: | | | |
| Offer letter | dma | 10 | |
| Date Sent | 4/11/2016 | 10 | |
| Letter of acceptance: | hf | 10 | |
| Date Sent | 4/11/2016 | 10 | |

CONFIDENTIAL

ME01244



## Christine Steele

**From:** Kristy Swart Smith
**Sent:** Friday, October 09, 2015 2:03 PM
**To:** Christine Steele; Doug Lang; Gordy McGuire; Beau Easton
**Subject:** RE: Committee Recommendations - Sims vs Frasier
**Attachments:** Simms v Fraiser, 10-6-15.docx

Exhibit A may be difficult to see. Please see attached for the original copy minus signatures.

Thanks,
Kristy

Kristy Swart Smith CPM, MSIO
Project Facilitator and Analyst
Meyer Tool, Inc.
Cell Number: 513-258-6106
Desk Number: 513-591-5236
Email: kristy.swartsmith@meyertool.com
Address: 3055 Colerain Ave., 2nd Floor South, Cincinnati, OH 45225

Information contained herein is the property of Meyer Tool, Inc.
Reproduction, disclosure, or use thereof is permissible only as intended or as provided by contract or as expressly
authorized in writing by Meyer Tool, Inc.

If this document contains information which is designated subject to EAR and/or ITAR export control by the U.S.
Government, it should not be transferred within the U.S. to any foreign national, or abroad without a valid export
license from the U.S. Government, or license exemption is obtained/available from the United States Department of
State.

If you receive this e-mail in error, please so notify the sender and delete or destroy the material from any media.

-----Original Message-----
From: Christine Steele
Sent: Friday, October 09, 2015 1:57 PM
To: Doug Lang <doug.lang@meyertool.com>; Gordy McGuire <gordy.mcguire@meyertool.com>; Beau Easton
<beau.easton@meyertool.com>
Cc: Kristy Swart Smith <kristy.swart@meyertool.com>
Subject: FW: Commitee Recommendations - Sims vs Fraiser

Please the conclusion of the Harassment claim of Sims and Frasier. We have included our recommendations.

Thank you,

Christine

Information contained herein is the property of Meyer Tool, Inc. Reproduction, disclosure, or use thereof is permissible
only as intended or as provided by contract or as expressly authorized in writing by Meyer Tool, Inc. If this document

1

CONFIDENTIAL

EXHIBIT

B

ME01918



The investigation committee's recommendations for corrective actions are contained herein to the President, Mr. Doug Lang, regarding the complaint of harassment by Huck Finn (EMP #47) in regard to Teresa Hopkin's (EMP #2146) email correspondence. These recommendations are a direct result of the investigation conducted by Paul Rowland (EMP #154), Nicole (Nikki) Fugate (EMP #2526), and Sarah Sweitzer (EMP #2910) between the dates of October 20, 2016 and October 25, 2016. All three committee members were unrelated to the incident.

Recommendations for corrective actions:

- The committee recommends that Teresa Hopkins complete individualized training from Be Employee Assistance Program (BEAP). This training is recommended to assist Teresa in understanding that there are different forms of bullying and inappropriate behavior, including text-based such as email. Teresa is expected to complete the training prior to December 15, 2016.
- The committee recommends issuing a verbal warning to Teresa Hopkins based on misuse of company property per Meyer Tool's Employee Handbook section 9:1 Use of Meyer Tool Property. This training is to occur prior to November 15, 2016.
- The committee recommends that Teresa Hopkins return to work October 25, 2016 and be paid for her time off.

Key notes pertaining to recommendations:

- The question was asked: How would you like to see this resolved? Both Huck and Teresa stated that they would have no issue working together following this investigation.
- The committee finds that Teresa did not engage in discrimination or harassment. The committee finds that Teresa did engage in bullying behavior through the misuse of Meyer Tool property. The committee finds that Teresa's behavior was not intentional bullying and was not malicious in nature. As such, the committee recommends a low level of disciplinary action.

Our recommendations are based off of interviews conducted with the following employees:

- Interviews conducted with:
  - Teresa Hopkins (EMP #2146) – Interview on 10/20/16 and 10/21/16
  - Deanna Adams (EMP #2800) – Interview on 10/21/16
  - Huck Finn (EMP #47) – Interview on 10/21/16

The following provides the timeline of events for the Harassment Committee Investigation regarding email correspondence between Teresa Hopkins and Huck Finn:

- October 20, 2016:
  - 1:00pm – Committee formed. Committee members:
    - Paul Rowland
    - Sarah Sweitzer
    - Nikki Fugate



Page 1

ME01465

# In The Matter Of:

*William H. Cannon-El v.*
*Meyer Tool Incorporated*

---

*Nicole Fugate*
*January 20, 2017*

---

# On-Time Reporting

*Steno and Video Services - Ohio and Kentucky Notaries*
*8739 Landen Dr. - Maineville, OH 45039*
*schedule@ontimereporting.com*

*513.290.3233*





Min-U-Script® with Word Index

**EXHIBIT**

tabbies

D

1  that or anyone else to call 911, correct?

2      A.    No.

3      Q.    Now, in the past, it was your

4  understanding that Ms. Steel handled all the

5  complaints from the employees?

6      A.    Yes.

7      Q.    And is it your understanding then that

8  she kept those in her file in her office?

9      A.    I'm not sure how she handled them.

10         (Deposition Exhibit No. 49 was marked.)

11     Q.    Now, as far as -- when you first -- you

12  were advised by Gordy McGuier that you would be

13  sitting on the committee?

14     A.    No.  I was informed by Deanna.

15     Q.    So she initially told you?

16     A.    She told me, and she told me that Doug

17  Lang had chosen me for that committee.

18     Q.    Okay.  Was there any discussion between

19  you and Deanna about pulling Rick's file to see if

20  there's been any complaints made against him?

21     A.    Yes, based on Will Cannon's statement

22  and John Poff's statement that they had previously

23  complained about him.

24     Q.    Okay.  And was that done?

1    Q.    Did another person stop by?  Did someone

2  send you an email, a text, anything of that

3  nature?

4    A.    No.  We kept that between the three of

5  us.

6    Q.    Okay.

7    A.    And I would say just in regard to saying

8  that these -- that this is the (indicating) end

9  all, be all, that it couldn't be altered after

10  that, it hadn't been sent along to the president

11  for approval.  Just with Becky and I sending it

12  back and forth and reviewing it with Paul, that

13  was the point that we determined...

14    Q.    So the president, I understand,

15  Mr. Lang, could have looked at it all and

16  basically said, yes, no, part of it I agree with,

17  part of it I don't, whatever?

18    A.    Yes.

19    Q.    Now, so at that point, basically,

20  though, you had collected information, there was

21  no new information, and that was the end of it?

22    A.    Correct.

23    Q.    Okay.  And is there any reason that you

24  basically waited to advise Mr. Cannon for five

1      789.

2                (Deposition Exhibit No. 60 was marked.)

3      A.    Yes, this appears to be the final draft.

4      Q.    (By Ms. Grubb)  And then there was some

5  emails going back and forth about back pay, that

6  Mr. Cannon should receive back pay for the

7  duration of the suspension.  Beau and Julie were

8  both consulted on this decision and concur.

9                This went up the chain, then, regarding

10 his back pay?

11     A.    Yes.

12     Q.    And you don't know whether or not he

13 ever received back pay?

14     A.    I don't.  I know that it was approved

15 that he would receive back pay, but I wasn't

16 informed as to whether -- when he received it.

17     Q.    And you just dropped it.  You never saw

18 whether or not he received back pay or whether any

19 of the other recommendations were put in place?

20     A.    For the back pay, I think that that

21 would have been outside of my realm.  I don't

22 think that I would have been able to ask

23 accounting that type of information.

24                As far as the other recommendations, it

1   is the job of the committee to make sure that

2   these are issued to the president, but it's not

3   our job to enforce them in this case, the only

4   exception being that I took on that I would train

5   them on the complaint procedure.

6       Q.   Okay.

7       A.   So I knew that was an action item that

8   was mine and had to be completed by a certain

9   date.

10      Q.   Do you remember getting an email from

11  Doug Lang saying, Okay.  Has this been sent to

12  Arlyn yet?  I would like to talk to him first, and

13  then the chain just dies.

14           Do you recall anything regarding that?

15      A.   I do remember him saying that, yes.

16      Q.   And do you remember any follow-up or

17  anything to that?

18      A.   No.

19      Q.   Now, on June 7th, 11:50 a.m., there's

20  one from you:  I finished my additions to the

21  notes you started.

22           So we're back on interview with Mark

23  Metcalf, interview with Rick Ackerson, interview

24  with Steve Korb, Tina, Deanna, Glen Young, Gordy

| From: | Nikki Fugate <nikki.fugate@meyertool.com> |
| Sent: | Tuesday, June 07, 2016 8:36 AM |
| To: | Doug Lang; Beau Easton (beau.easton@meyertool.com) |
| Cc: | Becky Schwarz; Paul Rowland |
| Subject: | Harassment Committee Recommendations |
| Attachments: | Recommendations for events on 5-25-16 and 5-26-16.docx |

Good morning,

Attached please find our recommendations pertaining to the harassment committee's investigation of the incidents which occurred Wednesday, May 25 in the NPI area and Thursday, May 26 in the HR department.

Thank you,

*Nikki Fugate*
Training Instructor
Department of Continual Improvement
Meyer Tool Inc.
Cell: 513-615-5318
Desk: 513-591-5243

Information contained herein is the property of Meyer Tool, Inc. Reproduction, disclosure, or use thereof is permissible only as intended or as provided by contract or as expressly authorized in writing by Meyer Tool, Inc.

If this document contains information which is designated subject to EAR and/or ITAR export control by the U.S. Government, it should not be transferred within the U.S. to any foreign national, or abroad without a valid export license from the U.S. Government, or license exemption is obtained/available from the United States Department of State.

If you receive this e-mail in error, please notify the sender and delete or destroy the material from any media.



DEPOSITION EXHIBIT
40
2·17·17



EXHIBIT

1

MT000785

| From: | Nikki Fugate <nikki.fugate@meyertool.com> |
|---|---|
| Sent: | Tuesday, June 07, 2016 3:32 PM |
| To: | Doug Lang; Beau Easton (beau.easton@meyertool.com) |
| Cc: | Becky Schwarz; Paul Rowland |
| Subject: | Interview notes and written statements |
| Attachments: | Written Statements Harassment Committee 5-25-16 & 5-26-16.pdf; Interview with Mark Metcalf on June 2, 2016.doc.docx; Interview with Rick Ackerson on June 2, 2016.docx; Interview with Shireen Flick on June 3, 2016.doc; Interview with Steve Korb on June 3, 2016.doc.docx; Interview with Tina Loveless on June 2, 2016.doc.docx; Interview with Will Cannon on June 1, 2016.doc; Interview with Chris Bauer on June 1, 2016.doc; Interview with Deanna Adams on May 31, 2016 and June 2, 2016.doc; Interview with Glenn Young on June 2, 2016.doc.docx; Interview with Gordy McGuire on June 2, 2016.doc.docx; Interview with John Poff on June 1, 2016.doc; Interview with Maria Jackson on June 2, 2016.doc; Wednesday 6-1-2016 Phone Call with William Cannon.doc |

Good afternoon,

Attached are the written statements from those who observed the events on Wednesday and/or Thursday as well as the committee's interview notes.

Thank you,

*Nikki Fugate*
Training Instructor
Department of Continual Improvement
Meyer Tool Inc.
Cell: 513-615-5318
Desk: 513-591-5243

Information contained herein is the property of Meyer Tool, Inc. Reproduction, disclosure, or use thereof is permissible only as intended or as provided by contract or as expressly authorized in writing by Meyer Tool, Inc.

If this document contains information which is designated subject to EAR and/or ITAR export control by the U.S. Government, it should not be transferred within the U.S. to any foreign national, or abroad without a valid export license from the U.S. Government, or license exemption is obtained/available from the United States Department of State.

If you receive this e-mail in error, please notify the sender and delete or destroy the material from any media.

1



DEPOSITION
EXHIBIT
62

EXHIBIT

MT000862

# In The Matter Of:

*William H. Cannon-El v.*
*Meyer Tool Incorporated*

---

*Paul Rowland*
*February 17, 2017*

---

## On-Time Reporting

Steno and Video Services - Ohio and Kentucky Notaries
8739 Landen Dr. - Maineville, OH 45039
schedule@ontimereporting.com

513.290.3233



*Min-U-Script® with Word Index*



EXHIBIT
6

Page 13

1   then Beau Easton.
2   Q.   Now, as -- let me ask -- as plant
3   manager, what were your responsibilities?
4   **A.   Making sure that parts were manufactured**
5   **properly on time, also managing. Started out with**
6   **three people. When I passed it over three or four**
7   **years ago and I quit being a plant manager, there**
8   **were 140 there.**
9   Q.   Now, were you also as plant manager in
10   charge of the Affirmative Action Program?
11   **A.   No, everything but. Human resources**
12   **took care of...**
13   Q.   And how many employees directly reported
14   to you as plant manager?
15   **A.   All 140.**
16   Q.   Okay. Let's do this. Who were your
17   direct reports; in other words --
18   **A.   Rephrase.**
19   Q.   Obviously you wouldn't have 140 people
20   knocking at your door. So who reported directly
21   to you, what supervisors or managers?
22   **A.   All of the different areas. Over 25**
23   **years, there's been various ones.**
24   Q.   In 2013, who was reporting directly to

Page 14

1   you?
2   **A.   It would be Rick Stevens, Kerry June,**
3   **Craig Moore, Ron Hendershot. Those were all the**
4   **different area leaders.**
5   Q.   Now, in 2013, you said you then moved to
6   manufacturing director. How does that vary from
7   plant manager?
8   **A.   Now I assist in manufacturing processes**
9   **and training and working continually improving the**
10   **process or manufacturing techniques.**
11   Q.   Now, who reports to you as manufacturing
12   director?
13   **A.   Nobody.**
14   Q.   Okay. So if... you assist in training.
15   There appears to be individuals that their key
16   responsibility is training. Who would those
17   people be?
18   **A.   That would be Nikki.**
19   Q.   Nikki Fugate?
20   **A.   I'll elaborate on training. As I am**
21   **passing on my knowledge to each and every**
22   **department that needs my help, I am more of a**
23   **resource now doing training and improvement to any**
24   **place in the company based on my past experiences.**

Page 15

1   Q.   All right. So Nikki Fugate, even though
2   she does training, she doesn't report directly to
3   you?
4   **A.   No.**
5   Q.   Who does she report to?
6   **A.   I'm not sure who she reports to exactly.**
7   **Okay?**
8   Q.   How about Becky Schwarz?
9   **A.   Beau Easton.**
10   Q.   And as far as yourself, you also report
11   to Beau Easton?
12   **A.   Correct.**
13   Q.   And now, how long have you been sitting
14   on the investigative committee?
15   **A.   Well, it isn't just one committee.**
16   Q.   Who selects the committee members?
17   **A.   Management.**
18   Q.   When you say management, who is
19   management?
20   **A.   Doug Lang. He's the -- he's the**
21   **president of the company now. So, I mean, I get**
22   **my direction — I got my direction from him asking**
23   **me to be on this committee.**
24   Q.   So depending perhaps on the situation or

Page 16

1   scenario, you may sit on one committee or you may
2   not be asked?
3   **A.   A committee is formed after an incident.**
4   Q.   And the selection of those three
5   committee members would be controlled by Doug
6   Lang, to the best of your knowledge?
7   **A.   Yes.**
8   Q.   Now, when did he first contact you about
9   the committee regarding Mr. Cannon?
10   **A.   I'm not sure the date, but approximately**
11   **a week before we started having interviews, I**
12   **believe. Within a week.**
13   Q.   Now, did he contact you by phone, email,
14   text?
15   **A.   He phoned me and asked me.**
16   Q.   And did he tell you anything at that
17   time?
18   **A.   Nope.**
19   Q.   So he just told you that you'd be
20   sitting on the committee?
21   **A.   Yes.**
22   Q.   At that time, did he tell you who else
23   would be sitting on the committee?
24   **A.   I don't think so.**

Page 25

1   and find out what is the real truth.
2   Q.   Now, as far as -- did you know that --
3   you knew about the two individuals.  Were the --
4   you said there were two other individuals.  Were
5   they noted somewhere in the record that they may
6   have information relevant to the facts?.
7   A.   I believe during the interviews, their
8   names came up, so we wanted to talk to them.  And
9   I believe we did get statements from them also.
10  Q.   And do you -- before you speak to them,
11  do you ask them or do their supervisors ask them
12  to write statements?
13  A.   No.  The human resources takes care of
14  having all the employees write the statements, or
15  they submit their statements to human resources.
16  Q.   And so you wouldn't see how the
17  statements are written or under what conditions or
18  when; they're just provided to you?
19  A.   No, I was never present or knew the
20  conditions unless it came up during the
21  interviews.
22  Q.   Okay.  Now, did you interview anyone
23  more than once?
24  A.   On which committee?

Page 26

1   Q.   On this one that we're talking about,
2   Theresa and Huck Finn.
3   A.   Yes.  Theresa.
4   Q.   Theresa you interviewed twice?
5   A.   I believe twice.
6   Q.   And did you permit anyone to accompany
7   her in her interview?
8   A.   No.  We -- that's not standard.
9   Q.   Okay.  Now, did you inform her that
10  there's a possibility that discipline may result?
11  A.   Yes.
12  Q.   When did you inform her?
13  A.   During the first initial meeting, we are
14  going through, like I said before, the discovery
15  process.  And based on what is discovered, some
16  action will be taken or no action will be taken
17  based on the information that comes out.
18  Q.   Now, as far as Nikki's role in this
19  investigation, does she -- is she the one that
20  informs the individuals that the -- there may be
21  some action taken?
22  A.   Any time there is an incident, as we go
23  through collecting the information, then the
24  decision is made as to whether there will be

Page 27

1   action taken or no action taken.
2   Q.   Okay.  To your knowledge, was she,
3   Theresa, on suspension --
4   A.   I'd like to answer one --
5   Q.   I'm sorry.
6   A.   Based on our recommendation, okay, to
7   upper management, but they make the final
8   decision.
9   Q.   Do you know whether Theresa had been
10  suspended when they initially discovered this
11  problem until the time that she appeared before
12  the committee?
13  A.   Yes, she was.
14  Q.   And do you know how long?
15  A.   No.
16  Q.   Do you know who suspended her?
17  A.   No.
18  Q.   Do you know whether or not in this
19  recommendation she was reinstated?
20  A.   Yes.  She was reinstated back to work.
21  Q.   And was she paid for the suspension
22  time, to your knowledge?
23  A.   I believe she was.
24  Q.   Okay.  Was it your committee's

Page 28

1   recommendation to do so?
2   A.   It was our recommendation to reinstate
3   her back to work, and I believe -- I believe we
4   did recommend her also.
5   Q.   For pay?
6   A.   For pay, I believe.
7   Q.   Okay.  Your recommendations in Theresa's
8   case would then have to be all approved by upper
9   management?
10  A.   Yes.
11  Q.   Who specifically in upper management?
12  A.   I would say Beau Easton, Gordy McGuier,
13  and Doug Lang.  I'm going to say VPs.  That's my
14  belief.
15  Q.   Now, as far as the comments or the
16  emails that Theresa was sending, were they sexual
17  in nature?
18  A.   No.
19  Q.   So basically, without a lot of detail,
20  what were they regarding?
21  A.   A lot of religious content.
22  Q.   Okay.  As far as religious content, what
23  do you mean?
24  A.   Pictures, posters, statements.  I

# In The Matter Of:

*William H. Cannon-El v.*
*Meyer Tool Incorporated*

---

*Deanna Adams*
*January 20, 2017*

---

*Around-the-Clock Reporting Services*
*PO Box 11008*
*Cincinnati, OH 45211*

EXHIBIT

H

tabbies®

1      A.      He was the president of the company.  He
2   is now the chairman of the board.
3      Q.      When did he become the chairman of the
4   board?
5      A.      Last year, maybe beginning of December.
6      Q.      December 2016?
7      A.      Yes.
8      Q.      Currently, who do you report to?
9      A.      Doug Lang.
10      Q.      And his title is president?
11      A.      Yes.
12      Q.      What was his prior position?
13      A.      Executive vice president.
14      Q.      Now, to your knowledge, have you
15   discussed anything with Mr. Easton regarding
16   Mr. Cannon-El?
17      A.      No.
18      Q.      Have you discussed anything regarding
19   Mr. Cannon-El with Mr. Lang?
20      A.      Just that the -- the cases.
21      Q.      What do you mean the cases?
22      A.      The EEOC, the labor board.  And those
23   were the only two ones that I -- I let him be
24   aware that that was going on.



**John C. Greiner**
Direct: (513) 629-2734
jgreiner@graydon.law

GRAYDON
312 Walnut Street
Suite 1800
Cincinnati, OH 45202

Main    513 621 6464
Fax     513 651 3836

December 18, 2019

**VIA ELECTRONIC MAIL**
Magistrate Judge Karen L. Litkovitz
Litkovitz_chambers@ohsd.uscourts.gov

    *Re:*   *Rebeca Santiago v. Meyer Tool Inc., Case No. 1:19-CV-00032*

Dear Magistrate Litkovitz:

    Meyer Tool, Inc. ("Meyer Tool") respectfully requests that this Court limit Plaintiff's scope of her deposition of Meyer Tool President, Doug Lang, to address Mr. Lang's direct involvement in Meyer Tool's decision to terminate Plaintiff's employment on July 21, 2017. For the reasons stated below, Plaintiff's demands to depose Mr. Lang on topics beyond his direct involvement in Meyer Tool's decision to terminate Plaintiff's employment is nothing more than a fishing expedition that this Court should not permit.

    Plaintiff implies that Mr. Lang was intimately involved with Meyer Tool's decision to terminate Plaintiff's employment. This is not accurate. Meyer Tool's Human Resources Director, Deanna Adams, testified about Meyer Tool's procedures for employment terminations.[1] Generally, a Meyer Tool human resources representative contacts Meyer Tool's President, Doug Lang, among others, to notify them that Meyer Tool intends to terminate an employee. The human resources representative will briefly update Mr. Lang, often verbally, with Meyer Tool's reason(s) for the employment termination. Mr. Lang has the opportunity to agree or disagree with human resources' decision. Besides this brief, secondhand communication, Mr. Lang has no firsthand knowledge or involvement with Meyer Tool's decision to terminate an employee.[2] Ms. Adams testified that she followed this process when terminating Plaintiff.[3]

    Meyer Tool's retired Vice President of Operations, Gordon McGuire, testified to a similar process Meyer Tool follows for annual cost of living raises. Generally, Meyer Tool supervisors would receive a target cost of living increase, with all requested increases ultimately approved by the finance department and Mr. Lang. Similar to the termination procedure outlined above, Mr. McGuire *did not* testify that Mr. Lang was intimately involved in approving each employee's cost of living increase – rather, Mr. McGuire testified that decision was left strictly to front line supervisors.[4]

    Meyer Tool's procedures outlined above are far from unique. Most organizations maintain

---

[1] *See* November 15, 2019 Deposition testimony of Deanna Adams ("Adams Deposition"), pp. 74-78. Relevant excerpts of the Adams Deposition are attached at Tab 1.
[2] *Id.*
[3] *Id.*
[4] *See* November 13, 2019 Deposition testimony of Gordon McGuire ("McGuire Deposition"), pp. 11-12, 14-17. Relevant excerpts of the McGuire Deposition are attached at Tab 2.



an internal hierarchy that assigns final oversight of substantive employment decisions to its officers. This does not mean that these officers are directly involved in the day-to-day human resources functions, nor would these officers possess firsthand knowledge of the reasons for an employment termination.

Plaintiff stresses that Mr. Lang is intimately involved in Meyer Tool procedures for investigating harassment complaints and issuing corrective action related to them. But Mr. McGuire and Ms. Adams both testified that such investigations – identified in Meyer Tool Policy MT-21 – occur *only* after a complaint of harassment.[5] And Plaintiff unequivocally testified that she never complained about harassment to Meyer Tool – not during her employment, not when Meyer Tool terminated her employment, nor even when she sent a letter to Meyer Tool's Human Resources department six weeks after Meyer Tool terminated her employment.[6]

Quite simply, Meyer Tool followed the appropriate procedure for terminating Plaintiff's employment. Mr. Lang's involvement in that procedure is limited to a brief telephone call with Ms. Adams to review, provide ultimate approval for the decision.

Mr. Lang's deposition, in a broad sense, falls outside Federal Rule 26's permitted scope of discovery as it is not proportional to the needs of this case. Plaintiff's reference to depositions from the *Canon-El* case – an unrelated case that involved an investigation under Meyer Tool's Policy MT-21 – demonstrates how unnecessary Mr. Lang's testimony is to this case. Meyer Tool has and continues to make available for deposition the true decision makers relevant to this case; those with firsthand knowledge of Meyer Tool's termination of Plaintiff's employment.

Given Plaintiff's inability to justify the need to depose Mr. Lang beyond his direct involvement in Meyer Tool's decision to terminate Plaintiff's employment, it is reasonable to assume that Plaintiff's request to depose Mr. Lang is nothing more than a fishing expedition. The Court should not entertain Plaintiff's discovery request that is categorically beyond the proportional needs of this case – particularly when the Court has already extended Plaintiff's discovery cutoff twice.

For these reasons, Meyer Tool respectfully requests that this Court limit Plaintiff's scope of her deposition of Meyer Tool President, Doug Lang, to address Mr. Lang's direct involvement in Meyer Tool's decision to terminate Plaintiff's employment on July 21, 2017.

Sincerely,

GRAYDON HEAD & RITCHEY LLP

John C. Greiner

---

[5] Adams Deposition, pp. 59, 61-63; McGuire Deposition, p. 171.
[6] *See* November 112, 2019 Deposition testimony of Rebeca Santiago ("Plaintiff Deposition"), pp. 24, 85-86, Ex. 2. Relevant excerpts of the Plaintiff Deposition are attached at Tab 3.

Tab 1

# In The Matter Of:

*Rebeca Santiago v.*
*Meyer Tool, Inc.*

---

*DEANNA ADAMS*
*November 15, 2019*

---

*Around-The-Clock Reporting Services*
*Jean Long, RPR*
*P.O. Box 11008*
*Cincinnati, Ohio 45211*
*513.481.5200*

Original File 191115da.txt

Page 57

1 if it's a list of all complaints, incident
2 reports filed by who they were and then who
3 the complaint was against?
4          MR. ZIEPFEL: Objection.
5          THE WITNESS: You are going to
6 have to ask that question again because it
7 was just too --
8 BY MS. GRUBB:
9    Q. Sure. Can you tell me why your
10 complaints listed as against Mr. Cannon-El is
11 not on this list?
12    A. I just answered that.
13    Q. Because you believe it's legal and
14 anything that goes to a court of law, all
15 paperwork goes to that and it's not kept on
16 this list?
17    A. I didn't say that. I said that it
18 is not complete, that's why it's not there.
19    Q. Okay. How many outstanding cases
20 do you have that are not on this list then?
21    A. Three.
22    Q. And who are the three?
23    A. Cannon-El, Santiago, and I'm not
24 sure who the other one is, sorry.
25    Q. Is it a matter that has gone to

Page 58

1 court?
2    A. The one I can't remember.
3    Q. The third one, right?
4    A. No, it has not.
5    Q. When you say it's not completed, is
6 it sitting in the EEOC?
7    A. No.
8    Q. Is it a Workers' Compensation case?
9    A. No.
10    Q. But you don't recall, is it filed
11 in public records anywhere?
12    A. No, it's in my office in my drawer
13 for me to complete it out, that I had to
14 compile stuff for this, so it had to be to
15 set aside.
16    Q. And what type of complaint or issue
17 was it?
18    A. I didn't really get to read it, so
19 I'm not going to speculate. I don't know.
20    Q. Okay. So it just started, in other
21 words, someone brought in a complaint and you
22 are now convening a committee?
23    A. No, it's not going to committee,
24 it's not that sort of complaint for a
25 committee.

Page 59

1    Q. Has an internal investigation been
2 done on this complaint?
3    A. I have not started anything on this
4 complaint.
5    Q. And just so we are clear for the
6 record when I say internal investigation, I
7 don't want to misrepresent what that is.
8 What do you do, what does HR do in an
9 internal investigation?
10          MR. ZIEPFEL: Objection.
11          THE WITNESS: What do we do?
12 BY MS. GRUBB:
13    Q. Right.
14    A. I look into the facts. I interview
15 people. I get statements. And then I
16 consult the handbook and go by what the
17 policies and procedures say.
18    Q. And how do you determine whether
19 you are going to convene a committee and
20 whether you do an internal investigation?
21    A. Harassment is what we make a
22 committee for.
23    Q. Only harassment?
24    A. Yes.
25    Q. Any specific types of harassment?

Page 60

1    A. Where it's against sexual or
2 inappropriate comments or that it's ongoing
3 after the person says stop and they
4 continuously do it.
5    Q. And does that have to be a written
6 request?
7    A. No.
8    Q. So orally someone would come in and
9 you will conduct a, you will convene a
10 committee if someone complains orally?
11    A. I will write it down and then say
12 you will need to, I need to form an
13 investigation team.
14    Q. And for an internal investigation,
15 it's all other complaints, issues or matters?
16    A. What do you mean by internal
17 because they are both internal with Meyer
18 Tool?
19    Q. Well, the other was I should say
20 you have an internal committee and/or for
21 grievances, and then you have an internal
22 investigation, those are two separate
23 processes, correct?
24    A. But they are both internal, they
25 are both Meyer Tool processes.

Page 61

1    Q.   That's fine, but the investigation
2  does not involve paneling a committee?
3    A.   What?
4    Q.   In other words, okay, let me try to
5  make this clear.  It is my understanding you
6  have a committee, an internal investigative
7  committee team is established for harassment
8  and then I don't want to have to spend the
9  time listing all those, but what you just
10  testified to, okay, that's one type of
11  investigation.
12         For all other grievances, issues
13  that are non-harassment, you would do an
14  internal investigation, correct, that does
15  not involve a committee?
16    A.   I would look into the complaint.
17    Q.   Okay.  When you say I would look
18  into, you yourself?
19    A.   Me myself.
20    Q.   Okay.  And with the committee
21  there's three people, their findings are
22  written up, and then it's approved by upper
23  management, Doug Lang, am I correct?
24         MR. ZIEPFEL: Objection.
25         THE WITNESS: The president.

Page 62

1  BY MS. GRUBB:
2    Q.   Right, he's the one that makes the
3  final determination and then issues, agrees
4  or disagrees with the recommendations, makes
5  the final finding?
6         MR. ZIEPFEL: Objection.
7         THE WITNESS: He agrees or
8  disagrees with the findings of the
9  investigation.
10  BY MS. GRUBB:
11    Q.   Okay.  With an internal
12  investigation, however, there's obviously no
13  committee.  How is that internal
14  investigation documented as to how it's been
15  conducted?
16    A.   It's in its file folder and it will
17  have statements, witnesses, their things,
18  other statements, the complainant, the person
19  it was against.  I usually, it depends on
20  what it is.  I can't really say.  It could be
21  a writeup, it could be mandatory earn, which
22  is an employee assist program, or there could
23  be no findings.
24    Q.   And you would write to that effect,
25  you would write something in a memo or

Page 63

1  something to yourself at least because you
2  are the one conducting this internal
3  investigation?
4         MR. ZIEPFEL: Objection.
5         THE WITNESS: I would write
6  something that, no findings, and I would talk
7  to the person that put in the complaint.
8  BY MS. GRUBB:
9    Q.   Okay.  And these are not, these
10  internal investigation files or data that's
11  collected is not reviewed by Mr. Lang?
12    A.   No.
13    Q.   Okay.  Are these brought to his
14  attention anyway?
15    A.   Depends on what it is.
16    Q.   Okay.  Let's say it's an
17  allegation, someone hit someone, but you
18  couldn't substantiate it, would it still be
19  brought to his attention by yourself?
20    A.   It depends on the situation.
21    Q.   Okay.
22    A.   Did they go up to him and brush
23  against them or did they punch him in the
24  face.  You see there's a big difference
25  there.

Page 64

1    Q.   Okay.  Sure.  Is there, as far as
2  these internal investigations, if someone is
3  terminated, would that then have you take
4  that file and your investigative notes then
5  to Mr. Lang to bring him up to speed on that?
6    A.   If somebody was terminated, we
7  won't investigate.
8    Q.   As far as Mr. Easton, Beau Easton,
9  what role, if any, does he play as far as the
10  internal investigations?
11    A.   None that I know of.
12    Q.   I'm trying to understand whether or
13  not Mr. Beau Easton is in the chain of
14  command such that individuals, given his
15  executive position, feel comfortable or can
16  speak to him regarding a problem at work?
17    A.   It's an open door policy.
18    Q.   But there is no requirement that
19  they advise him of any problems that they may
20  be having at work, correct?
21    A.   Correct.
22    Q.   Okay.  Now as far as this internal
23  investigation, so if we look at AA, the last
24  time I deposed you, you said you were in the
25  middle of --

Page 73

1 they are free to come to anyone else in HR,
2 not just yourself, correct?
3         MR. ZIEPFEL: Objection.
4         THE WITNESS: Correct.
5 BY MS. GRUBB:
6    Q.  Okay.  So is it possible that he
7 consulted with someone else in your HR
8 department as to Ms. Santiago, let's say
9 January 1, 2017, to the present, to her
10 termination date of 7/20/2017?
11   A.  I don't know.
12   Q.  Okay.  Would they have had it
13 documented in a communication log form?
14        MR. ZIEPFEL: Objection.
15        THE WITNESS: No.
16 BY MS. GRUBB:
17   Q.  Would they have noted it in her
18 file?
19   A.  No.
20   Q.  Okay.  So he may have come in and
21 said hey, I got this employee, I want to talk
22 with you, and then there would be no
23 documentation of that conversation?
24        MR. ZIEPFEL: Objection.
25        THE WITNESS: Possible, yes.

Page 74

1 BY MS. GRUBB:
2    Q.  Okay.  But you yourself personally
3 never overheard him talking about Ms.
4 Santiago with anybody in the HR department?
5    A.  No, I never heard him talking about
6 anybody.
7    Q.  And you weren't part of any
8 conversations with him regarding Ms. Santiago
9 for the six months prior to her termination?
10        MR. ZIEPFEL: Objection.
11        THE WITNESS: Not that I recall.
12 BY MS. GRUBB:
13   Q.  Okay.  All right.  So at the point
14 that he came in with the form completed, am I
15 correct, the termination form completed?
16   A.  Yes.
17   Q.  All right.  And it was a single
18 form?
19   A.  I don't know.
20   Q.  Okay.  Did he hand it personally to
21 you?
22   A.  No.
23   Q.  Who did he hand it to?
24   A.  I think it was slipped under my
25 door.

Page 75

1    Q.  Okay.  So it was slipped under your
2 door?
3    A.  I'm not sure on that.
4    Q.  Okay.  So you believe it might have
5 been -- but you didn't have any face-to-face
6 conversation going here, I want to have you
7 take a look at this termination form?
8         MR. ZIEPFEL: Objection.
9         THE WITNESS: No.  Wait a
10 minute.  I think he did hand it to me and
11 said, you know, here's a form, I need you to
12 go through the process.
13 BY MS. GRUBB:
14   Q.  Okay.  And at that stage do you
15 then take the form and send it up the chain
16 because if it's a termination, you said it
17 has to be approved by upper management?
18   A.  Correct.
19   Q.  Who did you send that form to?
20   A.  I didn't send the form to nobody.
21   Q.  Okay.
22   A.  It would have been a call.  It
23 would have been a call from me to them.
24   Q.  Okay.  Who did you call first in
25 the case of Ms. Santiago?

Page 76

1         MR. ZIEPFEL: Objection.
2         THE WITNESS: I'm not sure who I
3 called first.  I think it was Doug Lang.
4 BY MS. GRUBB:
5    Q.  Okay.  And what did you say to
6 Mr. Lang and what did he say to you on that
7 call?
8    A.  I don't know, this is two years, it
9 was approved.
10   Q.  Okay.  He gave that approval?
11   A.  Yes.
12   Q.  Okay.  Did you have to say anything
13 regarding the facts and the circumstances of
14 termination?
15   A.  Yes.
16   Q.  I'm trying to get the gist of that
17 conversation.  And so he said yes.  The day
18 that Huck gave it to you, did he approve it?
19   A.  Who approve it?
20   Q.  Okay.  I was trying to abbreviate,
21 I shouldn't, I apologize, bad question.  The
22 day that Mr. Finn gave you Mr. Santiago's
23 termination form, you said you talked by
24 telephone to Mr. Lang.  Did Mr. Lang approve
25 that termination of Ms. Santiago the same day

Page 77

1  that you gave him the form?
2      A.  I don't know, I don't know if that
3  phone call happened then or later.  I don't
4  know the timeframe there.
5      Q.  Do you think it was within a day or
6  two?
7      A.  I don't know.
8      Q.  So when Mr. Lang verbally gives his
9  approval on something, is there some email or
10 documentation via text --
11     A.  No.
12     Q.  -- that he said it's okay?
13     A.  No.
14     Q.  All right.  So you heard that, I
15 said I approve, did he tell you why he was
16 approving it?
17     A.  He would have asked me what did the
18 supervisor say, why does the supervisor want
19 to terminate, is this, you know, is this what
20 he says on here, you know, I just explain
21 what he put on there, and he said yes, yes,
22 if the supervisor is good with it, I'm good
23 with it.
24     Q.  And you believe you did that same
25 discussion regarding Ms. Santiago on the

Page 78

1  phone with Mr. Lang?
2      A.  I would have just read from the
3  actual warning.
4      Q.  Okay.  So you would have read from
5  the warning.  Now when you get off the phone
6  do you note somewhere that he approved it
7  that day or time?
8      A.  No.
9      Q.  Do you have a policy or procedure
10 then by notifying the employee within 24
11 hours or how does that, what is the next step
12 after Mr. Lang approved the termination?
13         MR. ZIEPFEL:  Objection.
14         THE WITNESS:  When I can get to
15 it, I mean that's what -- I have to, when I
16 can get it in there.  When I can call him,
17 usually I try to do it right away but there's
18 no timeline.
19 BY MS. GRUBB:
20     Q.  Okay.
21     A.  If that's what you're asking,
22 there's no timeline.
23     Q.  Okay.  He's given the approval to
24 terminate someone and then you said you don't
25 make any notation, he said it was okay.  You

Page 79

1  at that point, at that point you get off the
2  phone, what next do you do with that paper
3  and who do you advise?
4          MR. ZIEPFEL:  Objection.
5          THE WITNESS:  What do you mean
6  who do I advise?
7  BY MS. GRUBB:
8      Q.  Well, wouldn't you have to tell the
9  supervisor that Mr. Lang approved the
10 termination?
11     A.  Yes.
12     Q.  Okay.  In Ms. Santiago's case, do
13 you recall getting the approval and then
14 advising Mr. Finn of the approval?
15     A.  That it was okay to move forward.
16     Q.  Okay.  And how did you advise Mr.
17 Finn of that?
18     A.  I would have said it's okay to move
19 forward.
20     Q.  Would you have done it by phone or
21 by email or text?
22     A.  I probably just handed him his form
23 back.
24     Q.  Okay.  So you would have gone out
25 onto the floor, and do you recall doing so?

Page 80

1      A.  No, he would have came in there and
2  I would have given it -- he would have came
3  to the HR department and I would have given
4  him the form back.
5      Q.  So you would have called him to
6  come from the shop?
7      A.  I don't know if I called him, I
8  don't know how, I mean --
9      Q.  Okay.  So within a couple of,
10 within a day or so you would have done that
11 of the approval?
12     A.  Yeah.  If I, I don't know if I -- I
13 don't know the timeline.  It would have been
14 on the forms.
15     Q.  At that point, once you handed it
16 back to Mr. Finn are you then out of that
17 discussion and then you just send a letter to
18 the employee?
19         MR. ZIEPFEL:  Objection.
20         THE WITNESS:  Once I get the
21 form back.
22 BY MS. GRUBB:
23     Q.  Back with her signature or his
24 signature?
25     A.  I don't know if it was a signature.

Tab 2

# In The Matter Of:
*Rebeca Santiago v.*
*Meyer Tool, Inc.*

---

*GORDON McGUIRE*
*November 13, 2019*

---

*Around-The-Clock Reporting Services*
*Jean Long, RPR*
*P.O. Box 11008*
*Cincinnati, Ohio 45211*
*513.481.5200*

Original File 191113gm.txt

Page 9

1  Q.  And who reported to you?
2  A.  Let's see, I had several people,
3  Jerry Blair -- I mean, excuse me, Jerry Ruff.
4  Edwin Finn, Jim Gloris, I guess those were
5  the -- and Mark Hempleman.
6  Q.  All right.  So as far as Mr. Finn,
7  when you left in 2018 what was his position?
8  A.  When I left he was the night shift
9  supervisor.
10  Q.  Okay.  And then you said there was
11  Jerry Ruff, Ed Finn.  Who else, I'm sorry?
12  A.  Jerry Ruff, he was the day shift
13  supervisor.
14  Q.  Okay.  And you said you had two
15  other individuals reporting?
16  A.  Yes, Jim Gloris, who was the tool
17  room supervisor.  And then Mark Hempleman, he
18  was the machine manager or supervisor.
19  Q.  And you are acquainted, of course,
20  with Mr. Rick Ackerson; does he report to
21  you?
22  A.  Yes, I forgot about these guys.
23  Q.  Okay.
24  A.  Be gone for a year and I just kind
25  of forget.

Page 10

1  Q.  All right.  Well, and so
2  Mr. Ackerson also reported to you?
3  A.  Yes.
4  Q.  And what position was he?
5  A.  He's our, I guess what they called
6  him at that time was, he was the supervisor
7  of the development and of hardware processes,
8  development and processes.
9  Q.  Now was Mr. Rick Ackerson over Mr.
10  Finn in 2016?
11  MR. ZIEPFEL: Objection.
12  THE WITNESS: No.
13  BY MS. GRUBB:
14  Q.  Okay.  So they were equal?
15  A.  Yes.
16  Q.  All right.  And this one, two,
17  three, four, five individuals all reported
18  directly to you.  Did they have any dotted
19  line reporting relationships to anyone else;
20  by that I mean they may have reported to you
21  but they also reported to someone else?
22  A.  They may have reported to other
23  people, depending, not necessarily reported
24  to them but worked with other people because
25  of the nature of their job.

Page 11

1  Q.  Okay.  Now as far as your, you said
2  you had day-to-day operations?
3  A.  Yes.
4  Q.  As far as the production itself, if
5  any of these, they are all gentlemen, had
6  issues or problems with production, then they
7  came to you?
8  A.  Yes, ma'am.
9  Q.  Okay.  And then if any of them had
10  employee problems, they would come to you,
11  shift scheduling problems, anything of that
12  nature?
13  MR. ZIEPFEL: Objection.
14  THE WITNESS: Yes, ma'am.
15  BY MS. GRUBB:
16  Q.  When it came to employee
17  evaluations, did you have to sign off on
18  those evaluations?
19  A.  We started the process towards, I'm
20  trying to think a minute here, yes, I did.
21  Q.  Okay.  Now when an employee is
22  evaluated, let's say, for instance, I'm
23  trying to think of, give a good example,
24  Mr. Ackerson is responsible for Glenn Young,
25  okay, he would get the evaluation form from

Page 12

1  HR, am I correct?
2  A.  Yes, ma'am.
3  Q.  And then he would complete that
4  evaluation form and then before it's given to
5  the employee, would he have to send it to you
6  for review?
7  A.  It would go, I would review all of
8  them and then they would go to HR.
9  Q.  And did you kind of sign off or
10  check off that you approved what was --
11  MR. ZIEPFEL: Objection.
12  THE WITNESS: I would just
13  initial.
14  BY MS. GRUBB:
15  Q.  Initial, okay.  All right.  Then
16  they were sent to HR.  Did they have any say
17  into the amount that, for instance,
18  Mr. Ackerson wanted to give Mr. Young and
19  that you approved or were they simply for
20  entering into the computer systems?
21  MR. ZIEPFEL: Objection.
22  THE WITNESS: To the best of my
23  knowledge it was strictly for entering the
24  information into the computer system.
25  BY MS. GRUBB:

Page 13

1    Q.  All right.  So, for instance, a
2  worker in HR, such as Tina Lovelace, couldn't
3  suddenly decide to change a rate?
4        MR. ZIEPFEL: Objection.
5        THE WITNESS: No.
6  BY MS. GRUBB:
7    Q.  Okay.  And in the last, I know it's
8  been a while since you have been retired;
9  however, was there in the last decade a time
10  where there was a set raise amount given to
11  all individuals?
12    A.  No set rate.  There was a guideline
13  to go by, okay.
14    Q.  Okay.
15    A.  There was a rate given out as a
16  guideline.
17    Q.  Mr. Ackerson recalls that in 2014,
18  I believe it was '14 through '16, that there
19  was a flat rate of 1.8 and then it was
20  changed later to 2.3?
21        MR. ZIEPFEL: Objection.
22  BY MS. GRUBB:
23    Q.  Did those numbers seem at all
24  familiar to you?
25    A.  Some of those numbers seemed right,

Page 14

1  yes.  You know, when, when the evaluations
2  are given out, there's a guideline number,
3  whether it was 1.8 or 2.8 or 3.5 or whatever
4  the case may be, and that was with the
5  supervisor was supposed to work his
6  evaluation, you know, within those rates.
7  Then if somebody was more or better, then you
8  would work accordingly.
9    Q.  Okay.  So maybe we can go into some
10  more detail as far as how that worked.  Who
11  set, some people call it a COLA, some people
12  call it cost of living adjustment, you
13  remember that from the form, who set that 1.8
14  or 2.3?
15    A.  To the best of my knowledge, it
16  would have been the financial department of
17  Meyer Tool and the president of Meyer Tool.
18    Q.  Okay.  How did they communicate
19  that to you so when you're reviewing
20  evaluations somebody doesn't get a 5.25?
21    A.  Well, they actually write it down
22  on the folder that's given out.  Then when I
23  handed the folders to the individuals, you
24  know, it would be there, there would be a
25  print-out sheet in each one of the folders

Page 15

1  and they would have the evaluation forms of
2  all the employees for that particular
3  supervisor.
4    Q.  Okay.  So, for instance, let's use
5  Mr. Ackerson.  That year, 2016, they may have
6  determined that 1.8 is going to be the cost
7  of living adjustment or the base rate --
8    A.  Yes.
9    Q.  -- adjustment, and he would be
10  given, you would give him a stack of folders?
11    A.  Yes.
12    Q.  With all his employees in them,
13  correct?
14    A.  Yes.
15    Q.  Okay.  And then he was to evaluate
16  and then bring those folders back to you?
17    A.  Yes.
18    Q.  To review?
19    A.  And we would review, yes.
20    Q.  Now if someone wanted to go above
21  whatever the set rate of 1.8 or 2.3, then
22  they would have to make a special notation or
23  discussion as to why it should be, correct?
24        MR. ZIEPFEL: Objection.
25        THE WITNESS: Yes.

Page 16

1  BY MS. GRUBB:
2    Q.  Then you would then, they would
3  have to say oh, this person gets a merit
4  increase because not only do they do their
5  work but they have taken on something
6  additional and that is worth another so many
7  cents, correct?
8        MR. ZIEPFEL: Objection.
9        THE WITNESS: Yes.
10  BY MS. GRUBB:
11    Q.  And so then you would be the one
12  that would have to approve something over and
13  above the 1.8?
14        MR. ZIEPFEL: Objection, form.
15        THE WITNESS: I wouldn't approve
16  it.  I would either agree with it because it
17  goes on to other people to approve, you know.
18  I can think okay, yes, this might be pretty
19  good, but I'm not the final say-so on the
20  raises or --
21  BY MS. GRUBB:
22    Q.  Who would be the final say-so?
23    A.  That would be the president and the
24  financial people at Meyer Tool.
25    Q.  Okay.  All right.  So no one is

Page 17

1 getting crazy because the president would
2 have to see and understand a justification
3 for that very large merit increase?
4      MR. ZIEPFEL: Objection, form.
5      THE WITNESS: Yes.
6 BY MS. GRUBB:
7   Q.  Okay.  Now you said, let's talk
8 about that folder.  There's the evaluation
9 form and then there are documents behind that
10 for each person that HR has stapled to the
11 form; for instance, it could be attendance,
12 it could be errors, it could be a
13 disciplinary writeup, things that went on in
14 that employee's history that year, correct?
15   A.  That is correct, yes.
16   Q.  And then all discipline and other
17 writeups for that particular evaluation
18 period, it would be the year preceding the
19 date of the evaluation, correct?
20      MR. ZIEPFEL: Objection. Form.
21      THE WITNESS: Preceding, yes.
22 It would be from the last time they got
23 evaluated to this current evaluation.
24 BY MS. GRUBB:
25   Q.  Right.  So, in other words, if you

Page 18

1 have an employee who is hired in 1998, you
2 didn't get an evaluation form with a stack
3 this big of every offense from 1998 to 2016?
4   A.  No, no, no, no.
5   Q.  Okay.  And to your understanding,
6 does the discipline fall off the record if
7 it's older than a year?
8   A.  It did at one time, yes, but I
9 don't know now.
10   Q.  As we sit here today, because you
11 are retired, they may have changed the
12 policy?
13   A.  Absolutely.
14   Q.  But when you left it was just that
15 year?
16   A.  Yes.
17   Q.  Okay.  Now as far as once the data
18 was inputted into the system was it your
19 understanding that the supervisor, such as
20 Rick Ackerson, was discussing the evaluation
21 then with the employee?
22   A.  Yes.
23   Q.  And was it your understanding that
24 they were having them sign those evaluations?
25   A.  Yes, that was my -- yes.

Page 19

1   Q.  All right.  And then from that
2 point was there any further input that you
3 had on the evaluation after the supervisors
4 provided them to their employees?
5   A.  No.
6   Q.  Okay.  At that point it's all
7 payroll and accounting to make any
8 adjustments?
9   A.  Yes, ma'am.
10   Q.  Okay.  All right.  Do you recall
11 any employee not being given that COLA or
12 that 1.8 percent out of Mr. Finn's
13 department?
14      MR. ZIEPFEL: Objection.
15 BY MS. GRUBB:
16   Q.  In the last ten years?
17   A.  I don't know which department, but
18 I know from time to time there were people
19 that did not get a cost of living raise or a
20 raise, period, no.
21   Q.  Okay.  Do you know what type, when
22 you said you recall, what situations did that
23 occur in?
24   A.  Normally it was a borderline
25 employee that, you know, their work ethic was

Page 20

1 bad and stuff of that nature.
2   Q.  And at that point if their
3 performance was such that didn't even warrant
4 a COLA increase, what did Meyer Tool do in
5 order to try to work with that employee or
6 rehabilitate that employee?
7      MR. ZIEPFEL: Objection.
8      THE WITNESS: From my standpoint
9 normally the employee knew it before it ever
10 come out, and the evaluation form would state
11 on there what he needed to do to improve
12 himself or herself or whatever because most
13 of the time the people know that, you know,
14 that they are probably not going to get a
15 very good raise because they probably have
16 been talked to and everything else trying to
17 give them the benefit of the doubt.
18 BY MS. GRUBB:
19   Q.  Okay.  Now do you make the referral
20 for what's called a PIP, a performance
21 improvement plan for the employees or does,
22 for instance, Mr. Ackerson, Mr. Ruff,
23 Mr. Finn, your first line supervisors do it?
24   A.  Those guys would figure out what
25 they need to do to improve, yes.

Page 169

1  you testified you had no issues with him in
2  that period?
3      A.  No, I've never had any issues with
4  Mr. Finn.
5      Q.  And during that time what was his
6  role in the company?
7      A.  Originally when I first took over,
8  he was day shift supervisor and then we made
9  him in the one area there and then he went to
10  night shift, he was over the whole second
11  shift then because we lost an individual on
12  second shift that normally did that, so we
13  put Huck in charge of that.
14     Q.  Okay.  Do you recall a reason why
15  he went to night shift?
16     A.  We asked him to.
17     Q.  Why did you ask him to?
18     A.  We had an individual had a heart
19  attack and went ahead and retired and Huck
20  was the most qualified individual to go to
21  second shift because he had done machining
22  and the whole nine yards so that's when we
23  asked him to do it, so he took the challenge
24  and went to the second shift.
25     Q.  You call it a challenge, why is

Page 170

1  that?
2      A.  The second shift, you're kind of
3  out there all alone, you know, you don't have
4  the support people that people do during the
5  day, you don't have the HR department,
6  although they are a phone call away, he
7  always had my number if he needed me or he
8  could call a certain engineer.
9          On night shift you don't have
10  the support people you have on day shift, so
11  to me it's a challenge, and I forget how many
12  people he supervised, probably fifty, eighty,
13  about fifty, sixty people, so there were
14  other individuals in charge of certain areas,
15  but he was over all of them.
16     Q.  Did other employees view the night
17  shift supervisor role as a challenge?
18     A.  No, I can't answer that, you know,
19  truthfully --
20     Q.  Fair enough.
21     A.  -- myself personally I would prefer
22  not to be on second shift.  Our second shift
23  was a pretty tough shift from 5:00, 4:00 to
24  the morning.
25     Q.  Okay.

Page 171

1      A.  Makes for a long day.
2      Q.  Yes, it does.  Can you do me a
3  favor and put in front of you Exhibit G,
4  which is the MT-21 policy.
5      A.  Yes.
6      Q.  Let me know when you have that.
7      A.  I have got it.
8      Q.  Okay.  You mentioned that you were
9  a part of two investigations?
10     A.  Yes, to the best of my knowledge it
11  was two, and there may have been a third one,
12  but I don't recall it, and I believe she had
13  two of them that my name was on, if I'm not
14  mistaken.
15     Q.  And you recall, before your memory
16  was refreshed, you recall one complaint of
17  harassment?
18     A.  The one was, yes -- no, they were
19  both harassments.
20     Q.  Okay.
21     A.  In my opinion.  One was sexual --
22  well, they both could be considered sexual
23  harassment.
24     Q.  Okay.  And you weren't, you had no
25  firsthand knowledge of those complaints of

Page 172

1  sexual harassment when you were assigned to
2  that investigative committee, did you?
3      A.  No, no, I wasn't aware of it until
4  I would get assigned to the committee and,
5  okay, what am I doing, and they brought us
6  all in a room and told us what was going on
7  and we would go from there.
8      Q.  So everything you learned about the
9  allegations and any defenses would be through
10  reviewing documents that you didn't create,
11  and through discussing this with witnesses?
12     A.  Correct.
13     Q.  Okay.  Was this policy in some
14  form -- you mentioned before there was always
15  some type of investigation process at Meyer
16  Tool.  Did, was this formalized in the
17  handbook revisions that we went over earlier
18  today, in the 2013 handbook revisions, or was
19  there a similar policy, written policy prior
20  to those revisions?
21     A.  No, I believe this was the original
22  policy.
23     Q.  Okay.  They put pen to paper in
24  2013?
25     A.  Yes, they went through quite a few

Tab 3

1          IN THE UNITED STATES DISTRICT COURT

2             SOUTHERN DISTRICT OF OHIO

3                 WESTERN DIVISION

4                    *    *    *

5    REBECA SANTIAGO,

6              PLAINTIFF,

        vs.                    CASE NO. 1:19-cv-00032

7

     MEYER TOOL, INC.,

8

              DEFENDANT.

9

10                   *    *    *

11          Deposition of REBECA SANTIAGO, Plaintiff

12   herein, called by the Defendant for

13   cross-examination pursuant to the Rules of Civil

14   Procedure, taken before me, Connie Sumner, RPR, a

15   Notary Public in and for the State of Ohio, at the

16   offices of Graydon Head & Ritchey, 312 Walnut

17   Street, Suite 1800, Cincinnati, Ohio on Tuesday,

18   November 12, 2019, at 9:15 o'clock a.m.

19                   *    *    *

20

21

22

23

24

25

1     (Telephone interruption.)
2     A.   Sorry. I'll put this on mute or turn it
3 off. Sorry about that.
4     Q.   That's okay. Your letter is dated,
5 Exhibit 1, which we looked at a moment ago, is dated
6 July 27th. And you wrote a letter to Meyer Tool
7 complaining about your termination on
8 September 15th, so that's, you know, about six
9 weeks. I'm just wondering why it took six weeks for
10 you to write -- to send this letter to Meyer Tool?
11    A.   I believe I was in a position I was trying
12 to find counsel about what to do next because I knew
13 it was not the right -- it wasn't fair.
14    Q.   Okay. Did you talk to a lawyer before you
15 wrote the September 15th letter?
16    A.   I believe so. Can I talk to her before
17 you ask the next question?
18    Q.   Sure. You guys want to step out for a
19 minute?
20         (Off the record.)
21         MS. GRUBB: Let's put this on the
22    record what I've instructed Miss Santiago
23    to do. You can inquire if she talked to an
24    attorney. The only thing that she will not
25    answer that we'll object to is any

1     discussions with a lawyer as that is
2     privileged and she's not waiving the
3     privilege.
4         MR. GREINER: I understand.
5         MS. GRUBB: So go ahead and answer.
6     You simply cannot talk about whatever was
7     talked about with any attorney or their
8     staff, okay?
9         THE WITNESS: Okay. Yeah, I believe
10    that I contact Miss Grubb to get counseling
11    about this because I knew something need to
12    be done after me working there almost 20
13    years just being fired like that, so I knew
14    not to write or say anything else until I
15    get counseling.
16 BY MR. GREINER:
17    Q.   So you did -- you did talk to a lawyer
18 before you wrote Exhibit 2?
19    A.   Yes.
20    Q.   Okay. Did you learn any new information
21 about your situation between July 27th and
22 September 15th?
23    A.   New information?
24    Q.   Yes.
25    A.   Regard?

1     Q.   Regarding the reason for your termination.
2     A.   No, because I didn't come to -- this was
3 the only things that I contact them with.
4     Q.   Okay.
5     A.   That I remember.
6     Q.   Okay. In looking at Exhibit 2, there's
7 nothing in Exhibit 2 about any harassment, is there?
8     A.   No.
9     Q.   Okay. And there's nothing in Exhibit 2
10 about gender discrimination, is there?
11    A.   Nope.
12    Q.   There is nothing in Exhibit 2 about you
13 being paid less than male employees, correct?
14    A.   Correct.
15    Q.   Okay. And when you say in Exhibit 2, you
16 say I believe that Huck Finn terminated my position
17 due to my use of FMLA leave due to my -- to a
18 disability (my HIV condition) and his actions were
19 discriminatory in that the reason he stated for my
20 termination was due to four bad parts. You told me
21 earlier, I think, that you believe that your FMLA
22 use was the reason for your termination because of
23 the reaction you would get from Huck Finn when you
24 would call in sick; is that right?
25    A.   Yes.

1     Q.   And he was just gruff about it usually?
2     A.   I don't know what that word means.
3     Q.   He wasn't friendly, right?
4     A.   Yes.
5     Q.   Is that -- is that how you describe those
6 conversations?
7     A.   Yeah.
8     Q.   Okay.
9     A.   Inappropriate, unnecessary.
10    Q.   He seemed irritated, right?
11    A.   Yes.
12    Q.   Okay. When you would call in sick, as the
13 supervisor that would mean that Huck would have to
14 figure out a way to cover the shift, right?
15    A.   I don't know what he need to do.
16    Q.   Well, don't you think that stands to
17 reason?
18    A.   I -- do you want me to assume, to guess?
19    Q.   I don't want you to assume anything.
20    A.   I don't know his work. I only know mine,
21 so I don't know what he need to do next.
22    Q.   Okay. So if you weren't there for your
23 shift --
24    A.   Okay.
25    Q.   -- somebody would have to cover for you,

1 And it lays out how the point system works. It
2 sounds like you didn't really focus much on, read
3 this?
4    A. Yes, this is the first time I see it to be
5 honest.
6    Q. You were not aware of it really until
7 today, right, okay.
8        (Thereupon, Exhibit No. 16, Meyer Tool,
9 Inc. Performance and Training policies, was
10 identified for purposes of the record.)
11 BY MR. GREINER:
12    Q. Okay. Take a look at Exhibit 16, please.
13 Exhibit 16 is another part of the handbook. In
14 Section 11:1, which is on 882, right in front of
15 you, indicates that poor job performance will lead
16 to discipline up to and including termination, you
17 see that, correct?
18    A. Yes.
19    Q. And you understood, I'm going to assume,
20 that as in any job a poor performer is subject to
21 being terminated, right?
22    A. Not right away, but I guess eventually.
23    Q. If the performance doesn't improve, right?
24    A. I guess.
25    Q. Okay. And you understand that the parts

1 that you were working on that Meyer Tool
2 manufactured were used in some cases in jet engines,
3 right?
4    A. Yes.
5    Q. So if those parts didn't meet
6 specifications, you would agree there's a risk that
7 it could lead to a catastrophic failure, right?
8        MS. GRUBB: Objection. Go ahead.
9        THE WITNESS: I assume that, yeah.
10       It was important job.
11 BY MR. GREINER:
12    Q. And would you agree that deviating parts,
13 it would be fair to characterize that as poor job
14 performance?
15    A. No.
16    Q. No. Why not?
17    A. Because we all made mistakes in this
18 industry, that's why there's a procedure to tell,
19 write out papers after you deviate something to be
20 aware that don't go further as a damaged, but that
21 don't avoid you from making mistakes.
22    Q. Sure. But if -- if one employee has a --
23 deviates a lot of parts and another employee only
24 deviates -- doesn't deviate many parts at all, would
25 you say the first employee is a poor performer?

1        MS. GRUBB: Objection. Go ahead.
2        THE WITNESS: I don't understand.
3        Can you rephrase that, please?
4 BY MR. GREINER:
5    Q. Yes. Let's just say you have an employee
6 who frequently winds up with deviated parts, would
7 you consider that poor performance?
8        MS. GRUBB: Objection. Go ahead.
9        THE WITNESS: Depending what you call
10       frequently.
11 BY MR. GREINER:
12    Q. Well, tell me, how often would it have to
13 happen before you could call that person a poor
14 performer?
15    A. I'm not the one to judge. I'm just saying
16 your question, it's not specific about what's the
17 amount of time that you're insinuating is poor
18 performance, that's not for me to be the judge.
19    Q. Okay. You can't answer that question?
20    A. No.
21    Q. How about if the deviation results from
22 the employee not paying attention to the operation
23 sheet, would you call that poor performance?
24        MS. GRUBB: Objection. Go ahead.
25        THE WITNESS: Yes.

1        (Thereupon, Exhibit No. 17, Meyer
2 Tool, Inc. Complaint Policies, was identified for
3 purposes of the record.)
4 BY MR. GREINER:
5    Q. Okay. Take a look at Exhibit 17, please.
6 Exhibit 17 is another portion of the Meyer Tool
7 Handbook, are you with me, and it says here
8 Complaint Procedure, do you see that?
9    A. Yes.
10    Q. And it says if an employee experiences an
11 incident or situation that could be considered
12 job-related harassment, the employee should
13 communicate to the offender specifically what is
14 offensive or that the behavior is disturbing or
15 state specifically what is bothersome. The employee
16 should then report these actions to their immediate
17 supervisor and/or the Human Resource Department
18 and/or a member of Senior Management. Do you see
19 that?
20    A. Yes, sir.
21    Q. You never followed this procedure --
22 strike that.
23       You never made a complaint about any kind
24 of harassment to the Human Resource Department,
25 correct?

**Page 86**

1  A. Right.

2  Q. And you never made a complaint about any

3 harassment to any member of Senior Management; is

4 that correct?

5  A. Right.

6  Q. Did you -- okay. Strike that.

7     (Thereupon, Exhibit No. 18,

8 November 2, 1999 Employee Warning Report, was

9 identified for purposes of the record.)

10 BY MR. GREINER:

11  Q. Let's take a look at Exhibit 18, please.

12 Exhibit 18 is an Employee Warning Report from

13 November 2nd of 1999. And you were given a warning

14 for a failure to follow instruction, do you see

15 that?

16  A. Yes.

17  Q. And you signed this report, correct?

18  A. Yes.

19  Q. And you gave no comments on the report,

20 correct?

21  A. Yes.

22  Q. And it appears that, at least according to

23 the warning report, that you had failed to follow

24 instructions on the operation sheet; is that

25 correct?

**Page 87**

1  A. That's what it says, yes.

2  Q. Okay. And it was 1999, so I -- I assume

3 you don't have any specific recollection of this,

4 correct?

5  A. Apparently not, but I would like to know

6 what that's saying there, operation sheet what?

7  Q. Page two, it looks like. I think it might

8 be --

9  A. See attached, anyway yeah, what's your

10 next question?

11  Q. Were you retrained after you got this

12 notice?

13  A. I would not know unless you showed me a

14 paper I was.

15     MS. GRUBB: You have to look at the

16   entire exhibit when he's directing you to

17   an exhibit.

18     THE WITNESS: Okay. Sorry about

19   that. So your question to me was? Sorry.

20 BY MR. GREINER:

21  Q. Do you recall whether you had retraining

22 after this?

23  A. No.

24  Q. Okay. Your supervisor was Chuck Martin;

25 is that correct?

**Page 88**

1  A. Yeah. He was not -- I don't think he was

2 supervisor, he was lead man.

3  Q. Okay.

4  A. Because supervisor title, I think it was

5 for Chuck -- I mean for Huck.

6  Q. Got you. Okay. Is that the same as cell

7 lead?

8  A. I guess, yeah, it would mean the same.

9     (Thereupon, Exhibit No. 19, April 29,

10 2002 Employee Warning Report, was identified for

11 purposes of the record.)

12 BY MR. GREINER:

13  Q. Okay. Take a look at Exhibit 19, please.

14 Exhibit 19 is a verbal warning that was given to you

15 April 29th, 2002 for substandard work or work

16 quality. It's admittedly kind of hard to read, but

17 can you take a look at what it says and can you tell

18 me if that has any meaning to you?

19  A. Apparently it's -- it does have specific

20 dimensions of the result, according to the form 495

21 thousandths and 505 thousandths dimension and he

22 says it's under. It could be 494, nine, which is

23 half of my hair under, so it can be from there to

24 who knows what is the under that they're referring

25 to.

**Page 89**

1  Q. Okay. You did not sign this warning. I

2 don't suppose you have any recollection of why you

3 may not have signed it?

4  A. No. Maybe I did not even see it. It was

5 probably not bring it to me, who knows.

6  Q. Okay. The specifications that you talked

7 about, you know, those very precise specifications,

8 are those provided by the client that Meyer Tool is

9 working for, do you know?

10  A. I don't know if it's by the client, but

11 it's in the operations sheet.

12  Q. Okay. Got you.

13  A. I'm sorry when I mispronounce sheet.

14  Q. Yes, that's okay.

15  A. I'm not trying to be rude.

16  Q. Yes, that's okay.

17     (Thereupon, Exhibit No. 20, February

18 24, 2011 Employee Warning Report, was identified for

19 purposes of the record.)

20 BY MR. GREINER:

21  Q. Take a look at Exhibit 20, please.

22 Exhibit 20 is another -- Exhibit 20 is an Employee

23 Warning Report. It has to do with attendance. It

24 was dated 2/24/2011. And according to this, on 2/21

25 and 2/22, it says not coming to work, start to work

Natalie F. Grubb
Mark E. Owens

PH: (330) 725-7252
FAX: (330) 723-1095
E-Mail: officemgr@grubbandassoc.com

# Grubb & Associates, LPA

*Attorneys and Counselors at Law*

**437 W. Lafayette Road, Suite 260-A**
**Medina, Ohio 44256**

**www.grubbandassoc.com**

Employment, Labor &
Corporate Law
Commercial & Civil Litigation
Workers Compensation
Personal Injury
Family & Juvenile Law

**SENT VIA E-MAIL TO:**   litkovitz_chambers@ohsd.uscourts.gov; JGreiner@Graydon.law; NZiepfel@Graydon.law

December 19, 2019

Magistrate Judge Karen L. Litkovitz.
Potter Stewart U.S. Courthouse, Room 716
100 East Fifth Street
Cincinnati, OH 45202

   *Re: Santiago v. Meyer Tool Incorporated, Case No.* 1:19-cv-00032-SJD-KLL

Dear Magistrate Litkovitz:

   Plaintiff respectfully submits this brief rebuttal to the position statement regarding deposition of Doug Lang submitted by Defendant, Meyer Tool Incorporated ("Meyer Tool"), on December 18, 2019. First, Mr. McGuire clearly testified that any employee folders given to him recommending raises over and above the set COLA rate would have to go to "the president and the financial people at Meyer Tool" for final approval. (See *Lang Trans.*, pp. 16-17, relevant portions of which are attached hereto and are incorporated herein as **Exhibit A**). Mr. McGuire agreed that "no one is getting crazy because the president would have to see and understand a justification for that very large merit increase[.]" (See *Id.*)

   Meyer's argument that Mr. Lang has "no firsthand knowledge or involvement with Meyer Tool's decision to terminate an employee" is nonsensical, as it would equally be the case with Deanna Adams, Meyer's Human Resources Director. Ms. Adams would also get her facts and understanding of employee incidents "second hand" through first line supervisors and co-workers of the employee targeted for termination. Ms. Adams testified that she has no recollection of Plaintiff's supervisor, Huck Finn, consulting with her about Plaintiff in the six months prior to her termination. (See *Adams Trans.*, p. 72, relevant portions of which are attached hereto as **Exhibit B**). Nor could Ms. Adams recall being part of any conversations with Mr. Finn regarding Plaintiff. (See *Id.* at p. 74). In fact, she testified that she was not even involved in the termination process after Mr. Lang's approval or in the discussions with Plaintiff. (See *Id.* at p. 86).

   Relative to Mr. Lang, Ms. Adams testified that she discussed the specific facts and circumstances underlying the approval for the termination of Plaintiff in a telephone call directly with Mr. Lang. (See *Id.* at p. 76). After receiving answers from Ms. Adams to all of his

questions, Mr. Lang then gave Ms. Adams his approval to terminate Plaintiff's employment. (See *Id*. at p. 77). Ms. Adams is Mr. Lang's direct report. (See *Id*. at p. 22).

Meyer completely ignores the deposition testimony of JoAnne Poff, who was the HR Coordinator for Meyer. She testified that all paperwork for termination of employees would be brought to a Vice President and to Mr. Lang for their review (See *Poff Trans*., pp. 72-73, relevant portions of which are attached hereto and are incorporated herein as **Exhibit C**).

In addition, this Court should be mindful of the broad permissible scope of pretrial fact discovery under Federal Rule 26(b), which states: "Parties may obtain discovery regarding **any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case**, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable." (Emphasis added).

Doug Lang clearly has knowledge and information that meets this liberal standard, as supported by the deposition testimony of Mr. McGuire, Ms. Adams and Ms. Poff. His deposition should be permitted and not limited in scope, in the same manner as the depositions of all other fact witnesses in this case.

Very Truly Yours,

GRUBB & ASSOCIATES, LPA

*/s/ Mark E. Owens*
Mark E. Owens, Esq.

cc:    John C. Greiner, Esq.
       Nicholas J. Ziepfel, Esq.

       File Copy
       Client Copy

# In The Matter Of:
*Rebeca Santiago v.*
*Meyer Tool, Inc.*

---

*GORDON McGUIRE*
*November 13, 2019*

---

*Around-The-Clock Reporting Services*
*Jean Long, RPR*
*P.O. Box 11008*
*Cincinnati, Ohio 45211*
*513.481.5200*



EXHIBIT
A

BY MS. GRUBB:

Q.   Then you would then, they would
have to say oh, this person gets a merit
increase because not only do they do their
work but they have taken on something
additional and that is worth another so many
cents, correct?

MR. ZIEPFEL:  Objection.

THE WITNESS:  Yes.

BY MS. GRUBB:

Q.   And so then you would be the one
that would have to approve something over and
above the 1.8?

MR. ZIEPFEL:  Objection, form.

THE WITNESS:  I wouldn't approve
it.  I would either agree with it because it
goes on to other people to approve, you know.
I can think okay, yes, this might be pretty
good, but I'm not the final say-so on the
raises or --

BY MS. GRUBB:

Q.   Who would be the final say-so?

A.   That would be the president and the
financial people at Meyer Tool.

Q.   Okay.  All right.  So no one is

1  getting crazy because the president would
2  have to see and understand a justification
3  for that very large merit increase?
4             MR. ZIEPFEL:  Objection, form.
5             THE WITNESS:  Yes.
6  BY MS. GRUBB:
7      Q.   Okay.  Now you said, let's talk
8  about that folder.  There's the evaluation
9  form and then there are documents behind that
10  for each person that HR has stapled to the
11  form; for instance, it could be attendance,
12  it could be errors, it could be a
13  disciplinary writeup, things that went on in
14  that employee's history that year, correct?
15     A.   That is correct, yes.
16     Q.   And then all discipline and other
17  writeups for that particular evaluation
18  period, it would be the year preceding the
19  date of the evaluation, correct?
20             MR. ZIEPFEL:  Objection.  Form.
21             THE WITNESS:  Preceding, yes.
22  It would be from the last time they got
23  evaluated to this current evaluation.
24  BY MS. GRUBB:
25     Q.   Right.  So, in other words, if you

# In The Matter Of:
*Rebeca Santiago v.*
*Meyer Tool, Inc.*

---

*DEANNA ADAMS*
*November 15, 2019*

---

*Around-The-Clock Reporting Services*
*Jean Long, RPR*
*P.O. Box 11008*
*Cincinnati, Ohio 45211*
*513.481.5200*



EXHIBIT

B

1      A.   Christine Steele.

2      Q.   All right, but then she was

3 starting to take longer and longer leave

4 until she eventually left the company in that

5 2017 year, and then who did you report to?

6      A.   Doug Lang.

7      Q.   Okay, that was directly to Doug,

8 and has that changed at all?

9      A.   No.

10     Q.   Okay.  All right.  So in 2017 you

11 would not have known whether or not Ms.

12 Santiago would have received any pay

13 adjustments whatsoever?

14     A.   I would not.

15     Q.   In 2016 would you have any

16 knowledge about whether or not she received

17 any pay adjustments?

18     A.   No.

19     Q.   So at this point we have to rely

20 upon the records in her file, am I correct?

21     A.   Correct.

22     Q.   Okay.  And after assuming full time

23 all of the duties that Ms. Steele had, and I

24 understand there was a transition period,

25 have you now taken over the review of the

1   Q. No, with him regarding Rebeca?

2   A. No.

3   Q. Okay.  And then obviously a

4 termination cannot be approved, as you said,

5 without certain policies and certain steps.

6 Had he in the past at all provided

7 documentation as far as verbal warnings

8 documented on a corrective action form,

9 writeups documented on a corrective action

10 form?

11   A. I don't know.

12   Q. You don't know?

13   A. I don't know, it would be in her

14 personnel file.

15   Q. Do you recall him ever consulting

16 with you about Ms. Santiago in the prior six

17 months to her termination, she was terminated

18 July 20, 2017?

19     MR. ZIEPFEL:  Objection.

20     THE WITNESS:  Not that I recall,

21 I don't know.

22 BY MS. GRUBB:

23   Q. Is there, if the supervisors have

24 questions about an employee's performance or

25 how to discipline them or how to work them,

BY MS. GRUBB:

Q. Okay. But you yourself personally never overheard him talking about Ms. Santiago with anybody in the HR department?

A. No, I never heard him talking about anybody.

Q. And you weren't part of any conversations with him regarding Ms. Santiago for the six months prior to her termination?

MR. ZIEPFEL: Objection.

THE WITNESS: Not that I recall.

BY MS. GRUBB:

Q. Okay. All right. So at the point that he came in with the form completed, am I correct, the termination form completed?

A. Yes.

Q. All right. And it was a single form?

A. I don't know.

Q. Okay. Did he hand it personally to you?

A. No.

Q. Who did he hand it to?

A. I think it was slipped under my door.

1          MR. ZIEPFEL:  Objection.

2          THE WITNESS:  I'm not sure who I

3     called first.  I think it was Doug Lang.

4     BY MS. GRUBB:

5          Q.    Okay.  And what did you say to

6     Mr. Lang and what did he say to you on that

7     call?

8          A.    I don't know, this is two years, it

9     was approved.

10          Q.    Okay.  He gave that approval?

11          A.    Yes.

12          Q.    Okay.  Did you have to say anything

13     regarding the facts and the circumstances of

14     termination?

15          A.    Yes.

16          Q.    I'm trying to get the gist of that

17     conversation.  And so he said yes.  The day

18     that Huck gave it to you, did he approve it?

19          A.    Who approve it?

20          Q.    Okay.  I was trying to abbreviate,

21     I shouldn't, I apologize, bad question.  The

22     day that Mr. Finn gave you Mr. Santiago's

23     termination form, you said you talked by

24     telephone to Mr. Lang.  Did Mr. Lang approve

25     that termination of Ms. Santiago the same day

1    that you gave him the form?

2         A.   I don't know, I don't know if that

3    phone call happened then or later.  I don't

4    know the timeframe there.

5         Q.   Do you think it was within a day or

6    two?

7         A.   I don't know.

8         Q.   So when Mr. Lang verbally gives his

9    approval on something, is there some email or

10   documentation via text --

11        A.   No.

12        Q.   -- that he said it's okay?

13        A.   No.

14        Q.   All right.  So you heard that, I

15   said I approve, did he tell you why he was

16   approving it?

17        A.   He would have asked me what did the

18   supervisor say, why does the supervisor want

19   to terminate, is this, you know, is this what

20   he says on here, you know, I just explain

21   what he put on there, and he said yes, yes,

22   if the supervisor is good with it, I'm good

23   with it.

24        Q.   And you believe you did that same

25   discussion regarding Ms. Santiago on the

1  correspondence may have gone out between
2  7/20/2017 and 7/27/2017, correct?
3      A.    What do you mean correspondence?
4      Q.    Would there have been any other
5  emails, correspondence, texts between
6  yourself and Ms. Santiago?
7      A.    I don't know.  I don't know.  It's
8  possible, I don't know.
9      Q.    Okay.  Do you know whether or not
10 Ms. Santiago reported the day of 7/20/2017?
11     A.    No, I do not.
12     Q.    Okay.  So in other words, as Mr.
13 Lang gives the approval and go ahead with
14 that, you do not become involved in the
15 termination process or the discussion with
16 the employee?
17     A.    No.
18     Q.    Okay.
19     A.    Let me correct that.  Sometimes I
20 am, sometimes I'm not.
21     Q.    But with Ms. Santiago you were not?
22     A.    I was not.
23     Q.    And was there any reason that you
24 may become involved in the process?
25     A.    If the supervisor requests.

# In The Matter Of:

*Rebeca Santiago v.*
*Meyer Tool, Inc.*

---

*JoANNE POFF*
*November 15, 2019*

---

*Around-The-Clock Reporting Services*
*Jean Long, RPR*
*P.O. Box 11008*
*Cincinnati, Ohio 45211*
*513.481.5200*

Original File 191115jp.txt
Min-U-Script® with Word Index



EXHIBIT

1              THE WITNESS:  Yes.

2    BY MS. GRUBB:

3         Q.    Okay.  And you yourself never saw

4    one in writing from Ms. Santiago to the

5    company?

6         A.    No.

7         Q.    Okay.  Now as far as Ms. Adams, do

8    you know whether or not she worked closely

9    with Mr. Finn to discipline his employees?

10        A.    I couldn't answer that.

11        Q.    If a termination of an employee

12   were to take place, who does it have to be

13   approved by?

14        A.    All of management.  So I would go

15   to the vice president and the president

16   before a termination could be done.

17        Q.    Okay.  Vice president and

18   president, so that was Beau Easton?

19        A.    There's multiple vice presidents.

20        Q.    Okay.  And the president would be

21   Doug Lang?

22        A.    Yes.

23        Q.    So the paperwork would actually be

24   brought to them and reviewed?

25              MR. ZIEPFEL:  Objection.

1              THE WITNESS:  Yes.

2      BY MS. GRUBB:

3          Q.    And you would not be involved with

4      that, that would be something that Ms. Adams

5      would take it?

6                  MR. ZIEPFEL:  Objection.

7                  THE WITNESS:  Correct.

8      BY MS. GRUBB:

9          Q.    Do you recall ever being consulted

10     on Ms. Santiago's termination?

11         A.    No.

12         Q.    Do you recall anyone ever asking

13     your opinion?

14         A.    No.

15         Q.    Do you recall anyone in HR coming

16     to you, obtaining your, Ms. Santiago's FMLA

17     file or any other files that you may have

18     regarding Ms. Santiago?

19         A.    No.

20         Q.    You said those were reports that

21     Ms. Santiago could fill out.  Did the

22     supervisor have access to see what was put on

23     that report?

24                  MR. ZIEPFEL:  Objection.

25                  THE WITNESS:  What do you mean?