## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION – CINCINNATI

| | | |
|---|---|---|
| REBECCA SANTIAGO, | : | Case No. 1:19-cv-032 |
| | : | |
| Plaintiff, | : | Judge Matthew W. McFarland |
| | : | |
| v. | : | |
| | : | |
| MEYER TOOL INC., et al., | : | |
| | : | |
| Defendants. | : | |
| | : | |

## OPINION AND ORDER

This matter is before the Court on cross motions for summary judgment. Each party filed respective motions for summary judgment (Docs. 120, 121 & 122), which are each fully briefed and ripe for review (*see* Docs. 127, 129, 131, & 132). For the reasons provided below, Plaintiff's Motion is **DENIED** in its entirety and Defendants' Motion is **GRANTED IN PART and DENIED IN PART.**

### FACTS

This action revolves around whether Defendant Meyer Tool Incorporated ("Meyer Tool"), by and through Meyer Tool's Human Resources Director, Defendant Deanna Adams ("Adams"), and Plaintiff's direct supervisor, Defendant Edwin Finn, Jr. ("Finn"), discriminated against and mistreated Plaintiff Rebecca Santiago ("Plaintiff") during and after her employment with Meyer Tool. Plaintiff brings the following claims in her First Amended Complaint: gender discrimination in violation of Ohio law, disability

discrimination in violation of federal and Ohio law, violation of the Family Medical Leave Act ("FMLA"), gender-based pay discrimination in violation of federal and Ohio law, hostile work environment based on gender in violation of Ohio law, hostile work environment based on disability in violation of federal and Ohio law, wrongful termination, negligent retention and supervision, and defamation and slander. The Court considers the facts relevant to the claims addressed herein.

## I.    Meyer Tool and the EDM Process

Meyer Tool is a manufacturing company which manufactures precision components for turbine engines used in military and commercial jet planes. (Declaration of Meyer Tool's Human Resources Director Deanna Adams in Support of Defendant's Motion for Summary Judgment ("Adams MSJ Dec."), Doc. 120-2, Pg. ID 4193.) Due to how sought-after Meyer Tool's precision components are in the aerospace and gas turbine engine industries, Meyer Tool employs over 1,500 employees worldwide. (*Id.*) While Meyer Tool has worldwide locations, its headquarters and main manufacturing facilities are located in Cincinnati, Ohio. (*Id.*)

In its machining process, Meyer Tool utilizes a "Conventional Electrical Discharging Machining Tools" ("EDM"). (Declaration of Meyer Tool's Quality Control Director Rob Senitza in Support of Defendant's Motion for Summary Judgment ("Senitza MSJ Decl."), Doc. 120-11, Pg. ID 4249.) There are three steps to the EDM process. (*Id.* at 4250.) First, "a Meyer Tool employee must correctly load copper electrodes in the EDM" by using "a simple, prefabricated jig to confirm that the electrodes are perfectly straight forward." (*Id.*) Second, the same employee must "secure the turbine part in the EDM

fixture." (*Id.*) Third, "the employee is to initiate the EDM burn cycle by simply starting

the machine's operating program." (*Id.* at 4251.) After this three-step process is complete,

"the employee must only confirm that the EDM machine used the electrodes to burn

holes in the turbine part at the critically precise location and depth." (*Id.*) Finally, once

the EDM process is complete, "the employee is to remove the turbine part and start this

process again with a new raw turbine part." (*Id.*)

When a machinist does not properly follow this process, deviations to the part

occur. (*Id.* at 4250.) Meyer Tool defines a deviation as "[a]ny part machined beyond

tolerances acceptable by Meyer Tool – even by a thousandth of an inch[.]" (*Id.*) According

to Meyer Tool's Quality Control Director, Rob Senitza, there are two main reasons for

deviations to occur due to error by the machinist. (*Id.* at 4250.) First, "[i]f the employee

does not use the jig to check the electrodes, and thus places crooked electrodes in the

EDM, the machine will not burn holes in the turbine part in the correct location.' (*Id.*)

Second, "[i]f the employee does not secure the turbine in the EDM fixture correctly, the

EDM operation will not burn holes in the part in the correct location and/or depth." (*Id.*

at 4250-51.) As Senitza explained, "[t]he consequence of deviation from this process is a

deviated part." (*Id.* at 4251.) Meyer Tool has terminated machinists for producing

deviated parts in the past. (Adams MSJ Dec., Doc. 120-2. Pg. ID 4192.)

## II.    Meyer Tool's Employee Policies

Every Meyer Tool employee is required to sign the Meyer Tool Handbook

Acknowledgment Form ("Acknowledgment"). (*See* Handbook Acknowledgment Form,

Doc. 120-5, Pg. ID 2441.) By signing the Acknowledgement, the employee is affirming

that they understand they are "expected to read the [Employee] Handbook" and become familiar with its contents. (*Id.*) Additionally, of relevant note, the Acknowledgement requires the employee to affirm that the he or she understands that his or her "continued employment is contingent on following the policies contained in the Employee Handbook." (*Id.*)

Meyer Tool's Employee Handbook ("Handbook") has multiple policies related to employee conduct. First, and of relevant note, the Handbook has a Punctuality and Attendance Policy which defines unexcused absences and tardiness, as well as outlines the repercussions for continued violations of the Policy. (Punctuality and Attendance, Doc. 102-8, Pg. ID 2451-55.) Unexcused absences and tardiness are in violation of the Punctuality and Attendance Policy and Meyer Tool monitors these violations "using a point system to prevent abuse." (*Id.*) The policy explains that "[t]he points are cumulative for the rolling twelve month period . . . [and] [i]f an employee accrues no additional occurrences for a 90 day period, a point will be deducted from the cumulative total in recognition of the improvement." (*Id.*) Frequent violations will result in disciplinary action against the employee. (*Id.*) Such disciplinary actions include, but are not limited to, verbal warnings, written warnings, suspension, final warnings, and termination. (*Id.* at 2454-55.)

Next, the Handbook contains a Performance and Training Policy, which outlines performance expectations, corrective action, and training requirements during an employee's tenure with Meyer Tool. (Performance and Training, Doc. 102-9, Pg. ID 2456-2458.) Specifically, this policy states in no uncertain terms that "[p]oor performance will

4

lead to discipline, up to and including termination." (*Id.* at 2456.) Within the Performance and Training Policy, a separate section solely addresses corrective action when employees violate the Handbook. (*Id.* at 2456-57.) This section states in part:

> Violation of [non-Workplace Behavior] polices or procedures, whether set forth in this Handbook or elsewhere, shall also lead to corrective action but of a more traditional manner with verbal, written and/or final warnings before termination of employment results. It is within Meyer Tool's sole discretion to determine the appropriate action, corrective or otherwise, in any given situation.

(*Id.* at 2456-57.)

Meyer Tool "considers an employee's past attendance violations and work-related violations when evaluating the appropriate corrective action." (Adams MSJ Dec., Doc. 120-2, Pg. ID 4192.) Thus, when determining appropriate correction action, Meyer Tool will evaluate the prior conduct of the employee. When an employee has received corrective action for performance or attendance violations in the past, Meyer Tool may "skip a suspension" and instead "proceed immediately to termination of employment. . ." (*Id.*)

### III.    Plaintiff's Employment at Meyer Tool

Meyer Tool hired Plaintiff in 1998 as a parts inspector but, soon thereafter, transferred Plaintiff to a night shift machinist position. (Rebeca Santiago Deposition ("Santiago Dep."), Doc. 102-2, Pg. ID 2204, 2255.) Finn was Plaintiff's direct supervisor during her tenure with Meyer Tool. (Second Deposition of Edwin Finn ("Second Finn Dep."), Doc. 103-1, Pg. ID 2489.) Plaintiff was an EDM operator and, thus, was required to follow the EDM process described above. (*Id.* at 2496.) Additionally, Plaintiff was

required to abide by Meyer Tool policies as outlined in the Handbook. (Handbook Acknowledgment Form, Doc. 102-4, Doc. 2428.) Plaintiff signed the Acknowledgment on November 14, 2013. (*Id.*) By signing the Acknowledgment, Plaintiff certified that she understood that her "continued employment [was] contingent on following the policies contained in the Employee Handbook." (*Id.*) Additionally, Plaintiff was aware that "employees who deviate parts are subject to being fired." (Santiago Dep., Doc. 102-1, Pg. ID 2221.)

During Plaintiff's time at Meyer Tool, she violated multiple Meyer Tool policies and was subjected to corrective action on numerous occasions. (*See* Employee Warning Reports, Doc. 119.) First, Plaintiff violated the Attendance and Punctuality Policy on multiple occasions. (*See id.*) Specifically, Plaintiff violated the Attendance and Punctuality Policy on July 8, 2014, October 21, 2014, April 25, 2016, May 26, 2016, February 6, 2017, March 22, 2017, and June 20, 2017. (*Id.* at 4066-79.) These violations amounted to two verbal warnings, four written warnings, and two suspensions. (*Id.*) Plaintiff was even suspended from June 27, 2017 through June 29, 2017 for violating the Punctuality and Attendance Policy, less than thirty days before her termination. (*Id.* at 4079.)

Additionally, Plaintiff violated the Performance and Training Policy numerous times during her tenure with Meyer Tool. (*See id.* at 4080-4139.) Specifically, Plaintiff received corrective action for violating the Performance and Training Policy on November 2, 1999, April 29, 2002, February 24, 2011, May, 25, 2012, May 29, 2012, and July 14, 2017. (*Id.* 4080-89, 4132.) Additionally, the record reflects Plaintiff produced deviated parts on February 8, 2017, but received no corrective action for such deviations.

6

(*Id.* at 4130-31.) Plaintiff received corrective action for violating Meyer Tool Performance and Training Policy on six different occasions, amounting to two verbal warnings, one written warning, one suspension and, lastly, her termination. (*Id.* at 4080-89, 4132.) In 2016 and 2017 alone, Plaintiff violated either the Punctuality and Attendance Policy or the Performance and Training Policy on eight separate occasions, resulting in one verbal warning, three written warnings, two suspensions and, finally, her termination. (*Id.* at 4070-79, 4130-32.)

In May of 2017, Plaintiff deviated four additional parts after she failed to follow the EDM operations process. (*Id.* at 4134-37.) Plaintiff does not dispute that she deviated the parts. (Santiago Dep., Doc. 102-1, Pg. ID 2221.) She signed Corrective Action Forms, acknowledging that she deviated four parts on June 6, 2017. (May 26, 2017 Corrective Action Forms, Doc. 119-15, Pg. ID 4134-37.) Thus, Meyer Tool, having considered Plaintiff's past violations of the Handbook, determined that termination was warranted here. (Adams MSJ Dec., Doc. 120-2, Pg.ID 4193.) Adams reviewed the circumstances of Plaintiff's deviations and her employment history with four Meyer Tool executives. (*Id.*) All executives approved Plaintiff's termination. (*Id.*) On July 20, 2017, Plaintiff was terminated. (Termination Letter, Doc. 102-2, Pg. ID 2415.)

## IV. Procedural History

Following Plaintiff's termination, she filed an Equal Employment Opportunity Commission ("EEOC") questionnaire with the EEOC on October 23, 2017. (EEOC Questionnaire, Doc. 122-3, Pg. ID 4323-26.) On the questionnaire, Plaintiff stated, (1) that she has a disability, (2) that she believed that she was discriminated against because of

such disability, (3) that the disability is that she is human immunodeficiency virus ("HIV") positive, and (4) that she informed her boss of her disability. (*Id.* at 4323-24.) She continued, explaining that she was terminated for poor performance but that "many deviated dozens of parts and still work there after many years[.]" (*Id.* at 4325.)

After filing the EEOC questionnaire, Plaintiff filed her first Charge of Discrimination against Meyer Tool with the EEOC on October 31, 2017. (First Charge of Discrimination, Doc. 122-4, Pg. ID 4327-28.) There, she stated, (1) that she had been discriminated against on the basis of her disability, (2) that her work became "highly scrutinized" by Finn when she informed Meyer Tool of her disability, and (3) that, although she was terminated for producing non-conforming parts, others also produce non-conforming parts but remain employed. (*Id.* at 4327.) Plaintiff did not claim a hostile work environment on the basis of her disability, nor did she claim to be discriminated against based on her race, color, sex, religion, national origin, retaliation, age, genetic disability, or other reasons in the first Charge of Discrimination. (*See id.*)

Prior to receiving a Right to Sue letter from the EEOC, Plaintiff filed a second Charge of Discrimination against Meyer Tool with the EEOC on July 13, 2018. (Second Charge of Discrimination, Doc. 122-5, Pg. ID 4329-30.) This Charge of Discrimination claimed that Plaintiff had been discriminated against on the bases of sex and "other." (*Id.* at 4329.) In the "other" section, Plaintiff stated, "Title VII because of Sex and violation of Equal Pay Act[.]" (*Id.*) The Charge continued, claiming that Plaintiff was discriminated against in violation of Title VII, that she was sexually harassed by Finn, that she was paid less than her male counterparts and made to work less desirable shifts and assignments,

8

and that she was terminated due to her disability as explained in her first Charge of Discrimination. (*Id.* at 4329.)

Plaintiff then received two Right to Sue letters by the EEOC, each stating that "the EEOC [was] unable to conclude that the information obtained establishes violations of statutes." (First Right to Sue Letter, Doc. 122-6, Pg. ID 4331-33; Second Right to Sue Letter, Doc. 122-7, Pg. ID 4334-36.) Each Right to Sue letter, dated October 25, 2018 and April 19, 2019, respectively, provided that Plaintiff may sue under Title VII, the American with Disabilities Act, the Genetic Information Nondiscrimination Act, the Age Discrimination Employment Act, and the Equal Pay Act. (*Id.*)

Plaintiff filed her original Complaint on January 14, 2019. (Complaint, Doc. 1.) After filing its Answer (Doc. 8), Meyer Tool moved for Judgment on the Pleadings as to Plaintiff's gender discrimination in violation of Title VII and her wrongful termination against public policy claims. (Meyer Tool's Motion for Partial Judgment on the Pleadings, Doc. 14.) Magistrate Judge Karen Litkovitz, in her Report and Recommendation, recommended that the Court grant Meyer Tool's Motion in its entirety. (Report and Recommendation, Doc. 26, Pg. ID 171.) The Court adopted Magistrate Judge Litkovitz's Report and Recommendation over Plaintiff's objections, thereby dismissing Plaintiff's gender discrimination in violation of federal law and wrongful termination against public policy claims. (Order Adopting Report and Recommendations, Doc. 30, Pg. ID 185.)

Plaintiff filed her First Amended Complaint on November 27, 2019, which alleged the claims before the Court today. (First Amended Complaint ("Am. Compl."), Doc. 41,

Pg. ID 209-24.) Defendants then collectively moved to dismiss Plaintiff's Amended Complaint for lack of jurisdiction (Doc. 60), Magistrate Judge Litkovitz recommended the Court deny such motion (Doc. 88), and the Court adopted Magistrate Judge Litkovitz's Report and Recommendation (Doc. 104).

## LAW

Courts must grant summary judgment if the record "reveals that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (citing Fed. R. Civ. P. 56(c)). Once the movant has met its initial burden of showing that no genuine issue of material fact remains, the nonmoving party must present "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To do so, the nonmovant must present "significant probative evidence . . . on which a reasonable jury could return a verdict" in their favor. *Chappell v. City of Cleveland*, 585 F.3d 901, 913 (6th Cir. 2009).

The court "must view the facts and any inferences that can be drawn from those facts . . . in the light most favorable to the nonmoving party." *Keweenaw Bay Indian Comm. v. Rising*, 477 F.3d 881, 886 (6th Cir. 2007). This requirement, however, does not mean that the court must find a factual dispute where record evidence contradicts wholly unsupported allegations. "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (citing *Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). "If a moving party fulfills its burden of demonstrating that no genuine issue of material fact exists, the nonmoving party, to receive a trial, must

present some significant probative evidence creating a factual dispute." *Stratienko v. Cordis Corp.*, 429 F.3d 592, 597 (6th Cir. 2005).

## ANALYSIS

### I.   Defendants is Entitled to Summary Judgment on Plaintiff's Disability Discrimination Claims and Family Medical Leave Act Retaliation Claim as a Matter of Law.

Each party argues that they are entitled to summary judgment on Plaintiff's state and federal disability claim, as well as her FMLA retaliation claim. Because the relevant facts surrounding each claim are identical, Plaintiff's disability discrimination and FMLA retaliation claims are addressed herein. First, Defendants do not dispute that Plaintiff established a prima facie case for disability discrimination. However, Defendants claim that Plaintiff failed to establish a prima facie case for FMLA retaliation. Defendants also argue that Plaintiff's termination was due to a legitimate, nondiscriminatory and nonretaliatory reason. Plaintiff claims that she has established a prima facie case for her disability discrimination and FMLA retaliation. Additionally, Plaintiff argues that any reason for her termination was pretextual.

Plaintiff brings disability discrimination claims under both the American with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, and Ohio's anti-discrimination statute, Ohio Rev. Code § 4112.02. Because "Ohio disability discrimination law parallels the [ADA] in relevant respects," this Court may "appl[y] the same analytical framework, using cases and regulations interpreting the ADA as guidance in [its] interpretation of Ohio Rev. Code § 4112.02." *Belasco v. Warrensville Heights City Sch. Dist.*, 634 Fed. Appx. 507, 514 (6th Cir. 2015).

A plaintiff may establish discrimination or FMLA retaliation claims through either direct or indirect evidence. *See Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 453 (6th Cir. 2004); *see also Bryson v. Regis Corp.*, 498 F.3d 561, 570 (6th Cir. 2007). Direct evidence "is [] evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Satterfield v. Karnes*, 736 F.Supp. 2d 1138, 1157 (S.D. Ohio 2010). Plaintiff presents no direct evidence that her disability or FMLA leave was, at least, a motivating factor in her termination. She only relies on indirect evidence for her claims. Thus, this Court must apply the *McDonnell Douglas* burden-shifting framework here. *See Neuhardt v. Charter Commc'ns, LLC*, No. 2:17-cv-1019, 2020 WL 996450, *2-3 (S.D. Ohio Mar. 2, 2020).

When applying the *McDonnell Douglas* framework, Plaintiff bears the initial burden of establishing a prima facie case for her discrimination and FMLA retaliation claims. *Id*. at *3; *see also McDonnell Douglas Corp v. Green,* 411 U.S. 792 (1973). If Plaintiff satisfies her initial burden, the burden shifts to Defendants to establish a legitimate, nondiscriminatory reason for the adverse employment action. *McDonnell Douglas*, 11 U.S. at 802-03. If Defendants satisfies this burden, the burden shifts back to Plaintiff to show that Defendants' reason is mere pretext. *Id*. at 804.

### a. The Court Assumes that Plaintiff Has Demonstrated a Prima Facie Case for Disability Discrimination and FMLA Retaliation.

Again, when applying the *McDonnell Douglas* framework, Plaintiff bears the initial burden of establishing a prima facie case for her discrimination and FMLA retaliation claims. *Neuhardt*, 2020 WL 996450 at *3. However, the prima facie standards for each claim

12

differ. *See id.* First, to establish a prima facie case for disability discrimination, Plaintiff must demonstrate "(1) she has a disability, (2) she is otherwise qualified for the position, with or without reasonable accommodation, (3) she suffered an adverse employment decision, (4) her employer knew or had reason to know of her disability, and (5) she was replaced or her position remained open." *Williams v. AT&T Mobility Serv. LLC*, 847 F.3d 384, 395 (6th Cir. 2017). Additionally, to establish a prima facie case for a FMLA claim, a plaintiff must demonstrate: "(1) she availed herself of a protected right under the FMLA; (2) she suffered an adverse employment action; and (3) there was a causal connection between the exercise of her rights under the FMLA and the adverse employment action." *Bates v. Anthem Insur. Co., Inc.*, No. 1:18-cv-502, 2020 WL 4583218 at *8 (citing *Marshall v. Rawlings Co., LLC*, 854 F.3d 368, 381 (6th Cir. 2017)).

Defendants concede that Plaintiff has established a prima facie case for disability discrimination. (Defendants' Motion for Summary Judgment, Doc. 120, Pg. ID 4154.) Specifically, Defendants concede that a reasonable jury could determine that Plaintiff established that she has a disability, that Defendants were aware that she had a disability, that she was qualified for her position as a machinist, and that she suffered an adverse employment decision. (*Id.*) Thus, the Court assumes Plaintiff established a prima facie case for disability discrimination.

In contrast, Defendants argue that Plaintiff failed to establish a prima facie case for her FMLA retaliation claim. While Defendants concede that Plaintiff (1) has availed herself of a protected right under the FMLA and (2) suffered an adverse employment action, Defendants argue that Plaintiff cannot establish a causal connection between her

taking FMLA leave and the adverse employment action. (*Id.* at 4144.) First, Defendants argue that Plaintiff cannot establish temporal proximity between her FMLA leave and her termination because Meyer Tool approved Plaintiff for FMLA leave in 2014 and did not terminate Plaintiff until July of 2017. (*Id.* at 4149-50.) Second, Defendants argues that, based on the expert opinion of Dr. Siva Sivaganesan, the evidence shows that employees who exercise their rights under the FMLA have been found to be treated more favorably than employees who do not take FMLA leave at Meyer Tool. (Siva Sivaganesan Expert Opinion Report, Doc. 118-4, Pg. ID 3988-89.)

Plaintiff disagrees with both of Defendants' arguments. Plaintiff relies on the statistical analysis performed by Dr. Rebecca Fang to establish that a causal connection exists between her taking FMLA leave and her termination. (Brief in Support of Plaintiff's Motion for Summary Judgment, Doc. 122, Pg. ID 4269-70.) Specifically, Dr. Fang opined in her expert report that, based on her statistical analysis, "machinists who took FMLA leave between the years of 2014-2017 were more likely to be involuntarily terminated" than those who did not take FMLA leave. (Rebecca Fang Expert Opinion Report, Doc. 122-1, Pg. ID 4348.)

Here, the Court acknowledges that the facts presented seem to paint a picture suggesting that a genuine issue of material fact exists as to whether Plaintiff established a prima facie claim for FMLA retaliation. However, the Court, without deciding whether Plaintiff satisfied her burden, will assume that a prima facie case has been established for Plaintiff's FMLA retaliation claim as well as her disability discrimination claims.

### b. Meyer Tool Had a Legitimate, Nondiscriminatory Reason for Terminating Plaintiff.

Because the Court assumes that Plaintiff met her initial burden, "the burden then shifts to [Defendants] to demonstrate that there was a legitimate, nondiscriminatory reason for the adverse employment action." *Williams*, 847 F.3d at 395. "[Defendants] must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment decision." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993). "[V]iolations of express company policy are legitimate, non-discriminatory reasons for taking adverse employment action." *Schwendeman v. Marietta City Sch.*, 436 F. Supp. 3d 1045, 1061 (S.D. Ohio 2020) (citing *Blackshear v. Interstate Brands Corp.*, 495 Fed. Appx. 613, 618 (6th Cir. 2012)).

Here, Meyer Tool had a legitimate, nondiscriminatory and nonretaliatory reason to terminate Plaintiff. Defendants cite "Plaintiff's repeated failure to follow Meyer Tool policy and her substandard work product" as the reason for Plaintiff's termination. (Defendants' Motion for Summary Judgment, Doc. 120, Pg. ID 4154.) Plaintiff received corrective action on seven separate occasions due to violations of the Meyer Tool Punctuality and Attendance Policy. (Employee Warning Reports, Doc. 119, Pg. ID 4066-79, 4084.) Additionally, Plaintiff received corrective action on multiple occasions due to producing deviated parts in violation of the Meyer Tool Performance and Training Policy. (*Id.* at 4080-83, 4085-4139.) Specifically, in 2016 and 2017 alone, Plaintiff violated either policy on eight separate occasions, resulting in one verbal warning, three written

warnings, two suspensions and, finally, her termination. (*Id.* at 4070-79, 4130-32.) Plaintiff herself states that "[t]he only element of the claim that is in dispute is as to pretext," thus conceding that Defendant possessed a legitimate, nondiscriminatory and nonretaliatory reason for terminating Plaintiff. (Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment, Doc. 129, Pg. ID 5043.) Thus, because Plaintiff violated express company policies on numerous occasions throughout her tenure with Meyer Tool, Meyer Tool had a legitimate, nondiscriminatory and nonretaliatory reason to terminate Plaintiff.

### c. Meyer Tool's Legitimate, Nondiscriminatory Reason was not Pretextual.

The burden next shifts to Plaintiff to demonstrate that the legitimate, nondiscriminatory and nonretaliatory reason was solely pretext for unlawful disability discrimination and retaliation in violation of the FMLA. To demonstrate pretext, Plaintiff must establish that the proffered reason "(1) has no basis in fact; (2) did not actually motivate the adverse employment action; or (3) was insufficient to warrant the adverse action." *Sybrandt v. Home Depot, U.S.A., Inc.*, 560 F.3d 553, 558 (6th Cir. 2009). Additionally, "[P]laintiff may also demonstrate pretext by offering evidence which challenges the reasonableness of the employer's decision to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation." *Id.*

First, Plaintiff cannot prove that Meyer Tool's reason has no basis in fact. Plaintiff admits that she, in fact, did produce the deviated parts which led to her termination. (Santiago Dep., Doc. 102-1, Pg. ID 2221.) She signed Corrective Action Forms,

16

acknowledging that she deviated four parts on June 6, 2017. (May 26, 2017 Corrective Action Forms, Doc. 119-15, Pg. ID 4134-37.) She also committed numerous policy violates during her tenure at Meyer Tool, including eight violations in 2016 and 2017 alone. (Employee Warning Reports, Doc. 119, Pg. ID 4070-79, 4130-32.) Thus, Meyer Tool's reason for terminating Plaintiff has basis in fact.

Additionally, Defendants' proffered reason was sufficient to warrant Plaintiff's termination and was reasonable. Meyer Tool has a policy against substandard work performance. (Performance and Training, Doc. 102-9, Pg. ID 2456-2458.) Specifically, this policy explains in no uncertain terms that "[p]oor performance will lead to discipline, up to and including termination." (*Id.* at 2456.) Plaintiff signed the Acknowledgment on November 14, 2013, certifying that she understands that her "continued employment is contingent on following the policies contained in the [] Handbook." (Handbook Acknowledgment Form, Doc. 102-4, Doc. 2428.) Plaintiff even agreed that "employees who deviate parts are subject to being fired." (Santiago Dep., Doc. 102-1, Pg. ID 2221.)

Moreover, Plaintiff continuously violated Meyer Tool policy during the course of her employment, As discussed, Meyer Tool "considers an employee's past attendance violations and work-related violations when evaluating the appropriate corrective action." (Declaration of Deanna Adams, Doc. 120-2, Pg. ID 4192.) Plaintiff received corrective action many times for Attendance and Punctuality Policy violations as well as producing deviated parts. Again, such corrective action occurred on eight separate occasions in 2016 and 2017 alone. (Employee Warning Reports, Doc. 119, Pg. ID 4070-79, 4130-32.) Plaintiff was even suspended from June 27, 2017 through June 29, 2017 for

violating the Attendance and Punctuality policy on June 19, 2017. (Employee Warning Reports, Doc. 119, Pg. ID 4079.) This was approximately 30 days before Plaintiff's termination on July 20, 2017. Common sense tells this Court that an employer may consider all relevant factors, including past misconduct and prior corrective action, in determining whether certain conduct warrants an employee's termination. Plaintiff was given multiple opportunities to correct her conduct. She failed to do so. As such, because Plaintiff continuously violated Meyer Tool policy, Plaintiff's termination was warranted and reasonable.

Plaintiff's pretext argument seems to rely on the second method of proving pretext: that the proffered reason was not the actual motivating factor in Plaintiff's termination. Plaintiff argues that, because she was employed by Meyer Tool for numerous years and produced thousands of conforming parts, she could not have been fired solely for producing only four deviated parts. (Response in Opposition of Defendants' Motion for Summary Judgment, Doc. 129, Pg. ID 5045.) The Court is unpersuaded. Again, Plaintiff has violated Meyer Tool policy numerous times during her employment. She has produced multiple nonconforming parts, not only the four deviated parts in question. (Employee Warning Reports, Doc. 119, Pg. ID 4080-83; 4085-4139.) Plaintiff's termination was within a short window of her producing the four deviated parts and violating additional Meyer Tool policies. (See Employee Warning Reports, Doc. 119, Pg. ID 4132.) Thus, Plaintiff's violations of Meyer Tool policy, including but not limited to producing four deviated parts, was the motivating factor to her termination.

Plaintiff points to a single employee at Meyer Tool, Ruth Clark, who has produced deviated parts in the past but was not terminated. (Brief in Support of Plaintiff's Motion for Summary Judgment, Doc. 122, Pg. ID 4269.) However, the record reflects that Clark was suspended three days due to producing deviated parts. (Ruth Clark Employee Warning Report, Doc. 120-10, Pg. ID 4248.) The record is lacking, however, as to any other violations of Meyer Tool policy or other deviated parts produced by Clark. Additionally, the record shows over twenty other employees at Meyer Tool that have been terminated due to producing deviated parts or violating the Attendance and Punctuality Policy. (Employee Discipline Records, Doc. 120-8 & 120-9, Pg. ID 4209-47.) Thus, the Court is not persuaded by Plaintiff's argument.

Therefore, the Court finds that Defendants offered a legitimate, nondiscriminatory reason for Plaintiff's termination, and Plaintiff failed to establish that such reason was pretext. As a result, Defendants are entitled to summary judgment on Plaintiff's claims of disability discrimination in violation of the ADA and Ohio Rev. Code § 4112.02, as well as Plaintiff's FMLA retaliation claim, as a matter of law.

## II.    Defendants Are Entitled to Summary Judgment on Plaintiff's Wage Discrimination Claims as a Matter of Law.

Plaintiff also claims gender-based wage discrimination under both the Equal Pay Act ("EPA") and Ohio law. Each party claims to be entitled to summary judgment on such claims. Defendants argue that Plaintiff cannot establish a prima facie case for wage discrimination and, even if she can establish a prima facie case, Defendants have an affirmative defense for why she was paid less. Plaintiff disagrees, claiming she has

established a prima facie case for wage discrimination and that any defense by Defendants is solely pretextual.

The EPA disallows covered employers from discriminating "between employees on the basis of sex . . . for equal work . . ." *Kovacevich v. Kent State Univ.*, 224 F.3d 806, 826 (6th Cir. 2000); *see also* 29 U.S.C. § 206(d)(1). Ohio law parallels this sentiment, disallowing discrimination in the "payment of wages on the basis of sex . . . by paying wages to any employee at a lesser rate . . . to another employee for equal work . . ." Ohio Rev. Code § 4111.17(A). "Claims under Ohio's version of the [EPA], Ohio Rev. Code § 4111.17, are subject to the same standards as [] applied to claims under the federal statute." *Creech v. Ohio Cas. Ins. Co.*, 944 F.Supp.1347, 1353 (S.D. Ohio 1996).

While not the *McDonnell Douglas* framework, courts apply an eerily similar burden-shifting framework to wage discrimination claims. *See Briggs v. Univ. of Cincinnati*, 11 F.4d 498 (6th Cir. 2021). First, a plaintiff must establish a prima facie case for wage discrimination. *Id.* at 507. If a plaintiff establishes a prima facie case, the burden shifts to the defendant to prove that "the wage differential is justified under one of the affirmative defenses set forth" in the federal EPA and the Ohio EPA. *Kovacevich*, 224 F.3d at 826. The statutes' affirmative defenses mirror each other, allowing an employer to pay employees different wages for equal work when "such payment is made pursuant to (1) [a] seniority system; (2) [a] merit system; (3) [a] system which measures earnings by the quantity or quality of production; (4) [a] wage rate differential determined by any factor other than . . . sex . . ." 29 U.S.C. § 206(d)(1).; *see also* Ohio Rev. Code § 4111.17. To satisfy the fourth affirmative defense, a defendant must show that "at a minimum, it was

adopted for a legitimate business reason." *Briggs*, 11 F.4th at 508. If a defendant satisfies its burden, then the burden shifts back to the plaintiff to establish that "defendant's proffered explanation was pretextual." *Id.*

To establish a prima facie case for wage discrimination, a plaintiff "must show that an employer pays different wages to employees of opposite sexes for equal work." *Briggs*, 11 F.4d at 507-08 (quotations omitted). "Equal work does not require that the jobs be identical, but only that there exist substantial equality of skill, effort, responsibility, and working conditions." *Storrs v. Univ. of Cincinnati*, 271 F.Supp.3d 910, 935 (S.D. Ohio 2017) (quotations omitted). Simply, "the standard requires evidence that the positions are equal in all material respects . . ." *Creech*, 944 F.Supp. at 1353. Courts must make "an overall comparison of the work, not its individual segments" to determine if work is substantially equal. *Kovacevich*, 224 F.3d at 826.

Plaintiff failed to establish a prima facie case for wage discrimination because she failed to provide evidence that the comparators were performing equal work. Plaintiff relies on the fact that the comparators were male machinist and, thus, held the same title as her to establish that the positions are equal in all material respects. However, whether a comparator's position is equal in all material aspects "is not dependent on job classifications or titles but depends on actual job requirements and performance." 29 CFR § 1620.13(e). Actually, "[j]ob titles are frequently of such a general nature as to provide very little guidance in determining the application of the equal pay standard." 29 C.F.R. § 1620.13(e). Thus, the fact that the male comparators are also "machinists" is not enough to establish that the comparators are being paid more for equal work.

Plaintiff makes broad statements to persuade the Court that she has established a prima facie case. Plaintiff contends that, "[d]uring the entire time she was employed at Meyer [Tool], Ms. Santiago was paid less than comparable male machinists, including those trained by Ms. Santiago and having much less experience." (Brief in Support of Plaintiff's Motion for Summary Judgment, Doc. 122, Pg. ID 4272.) However, the Sixth Circuit has held that such conclusory allegations are not enough to establish a prima facie case for wage discrimination. *Conti v. Universal Enter., Inc.*, 50 Fed. Appx. 690, 697 (6th Cir. 2002). In *Conti*, the Sixth Circuit determined that, because the plaintiff failed to "come forward with evidence to show the specific duties and responsibilities of the positions held by [the male comparators] and whether those jobs and [plaintiff's] job required equal skill, effort, and responsibility and were performed under similar working conditions," the plaintiff failed to establish a prima facie case for wage discrimination. *Id.* Here, Plaintiff points to no evidence showing specific duties and responsibilities held by the male machinists nor whether the male machinists' positions and her position required equal skill, effort and responsibility and were performed under similar working conditions.

In a last-ditch effort to persuade the Court that the lack of specifics surrounding her comparators positions does not defeat Plaintiff's claims, she points to testimony by Finn stating that, when Plaintiff was not at work, Finn would have other machinists perform her duties. (Finn Dep., Doc. 103-1, Pg. ID 2506-07.) However, such contention does not establish equal work. The question is what skills, effort, and responsibility the male machinists possessed to perform *their position*. Plaintiff provides no specific

evidence of the male machinists' skills, efforts and responsibilities, and, thus, the Court is unable to make an overall comparison between Plaintiff and the comparators. Therefore, because Plaintiff failed to establish that the comparators are equal in all material respects, she failed to carry her initial burden.

Because Plaintiff failed to establish a prima facie case of wage discrimination, Defendants are entitled to summary judgment on Plaintiff's federal EPA claim and Ohio EPA claim as a matter of law.

### III. Plaintiff Failed to Exhaust Her Federal Hostile Work Environment In Violation of the ADA Claim.

Defendants argue that Plaintiff's hostile work environment in violation of the ADA claim should be dismissed because Plaintiff failed to exhaust her administrative remedies. Plaintiff disagrees, arguing that "a hostile work environment claim is reasonably related to allegations of unlawful discrimination and retaliation, and, therefore, may be considered even though not specifically included in the [First] EEOC charge." [1] (Pl. Response in Opp., Doc. 129, Pg. ID 5062.) The Court agrees with Defendants.

A plaintiff must exhaust her administrative remedies prior to bringing suit against a current or former employer under the ADA. *Russ v. Memphis Light Gas & Water Div.*,

---

[1] Plaintiff filed her two EEOC Charges of Discrimination with the EEOC after her termination. (First Charge of Discrimination, Doc. 122-4, Pg. ID 4327-28; Second Charge of Discrimination, Doc. 122-5, Pg. ID 4329-30.) A charge of discrimination must be filed with the EEOC within 300 days of the alleged discrimination for the charge to be considered by a court for exhaustion purposes. *Parry v. Mohawk Motors of Michigan, Inc.*, 236 F.3d 299, 309 (6th Cir. 2000). Plaintiff's Second Charge of Discrimination was filed outside of the 300-day window. (Second Charge of Discrimination, Doc. 122-5, Pg. ID 4329-30.) Thus, the Court only considers Plaintiff's First Charge of Discrimination and her EEOC Questionnaire for exhaustion purposes.

720 Fed.Appx. 229, 237 (6th Cir. 2017). A plaintiff must first file a charge with the EEOC containing the facts outlined in the Code of Federal Regulations for such charge to be sufficient. *See* 29 C.F.R. § 1601.12(a)(1)-(5). Also, "a charge is sufficient when the [EEOC] receives from the person making the charge a written statement sufficiently precise to identify the parties, and to describe generally the action or practices complained of." 29 C.F.R. § 1601.12(b).

Courts are to construe EEOC charges liberally, such that "claims that are included in the charge or are reasonably related to or grown out of the factual allegation in the EEOC charge may be heard in federal court." 29 C.F.R. § 1601.12(b). This is known as the "expected scope of investigation test." *Spengler v. Worthington Cylinders*, 615 F.3d 481, 490 (6th Cir. 2010). The expected scope of investigation test "requires a plaintiff to have alleged sufficient facts in his or her EEOC complaint to put the EEOC on notice of the other claim . . ." *Id.* "[A] plaintiff must present evidence of harassment that unreasonably interferes with [her] work performance and creates an objectively intimidating, hostile, or offensive work environment" to establish a hostile work environment claim. *Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 362 (6th Cir. 2010). The Sixth Circuit has explained that:

> We have suggested in several unreported cases that the inclusion in an EEOC charge of a discrete act or acts, standing alone, is insufficient to establish a hostile-work-environment for purposes of exhaustion. We now hold that such evidence, cited in an EEOC charge to support a claim of disparate treatment, will not also support a subsequent, uncharged claim of hostile work environment unless the allegation in the complaint can be reasonably inferred from the facts alleged in the charge.

*Id.* (quotations omitted).

The Court concludes that Plaintiff's first Charge of Discrimination, filed on October 31, 2017, even if liberally construed and considered in conjunction with her EEOC Questionnaire filed October 23, 2017, is insufficient to exhaust her administrative remedies for her federal hostile work environment claim. Plaintiff's first Charge of Discrimination alleged that she had been discriminated against based on her disability. (First Charge of Discrimination, Doc. 120-5, Pg. ID 4204.) In the "Particulars" section of the charge, Plaintiff alleged that she had a disability and was approved to take disability related leave. (*Id.*) She then alleged that, after returning from her leave, her "work was highly scrutinized by Supervisor Edwin Finn." (*Id.*) Additionally, she alleged that she was informed on July 20, 2017 by Finn that she was discharged for producing non-conforming parts. (*Id.*) Lastly, she alleged that others, including Ruth Clark, have produced non-conforming parts and not been discharged. (*Id.*)

The allegations contained herein do not support a hostile work environment claim. A hostile work environment claim cannot be reasonably inferred from the facts alleged in Plaintiff's first Charge of Discrimination. Plaintiff alleged no evidence of harassment that would interfere with her work and create an objectively intimidating, hostile, or offensive work environment. The only conduct that could be considered harassment is that Plaintiff's work was "highly scrutinized" by Finn. However, even if the Court considered this single claim as evidence of harassment, such allegation is "oblique" at best and, therefore, insufficient to put the EEOC on notice of a hostile work environment claim. *Russ*, 720 Fed. Appx. at 237. Moreover, such scrutiny would only constitute discrete acts and, "standing alone, is insufficient to establish a hostile-work-environment for

purposes of exhaustion." *Younis*, 610 F.3d at 362.

Therefore, Plaintiff did not exhaust her administrative remedies for her hostile work environment claim in violation of the ADA. Thus, Defendants are entitled to summary judgment on such claim as a matter of law.

### IV. The Court Declines to Exercise Supplemental Jurisdiction Over Plaintiff's Remaining State Law Claims.

Plaintiff asserted in her First Amended Complaint that this Court has jurisdiction pursuant to 28 U.S.C. § 1331, 1343(3) and 1343(4). (Am. Compl., Doc. 41, Pg. ID 202). Federal question jurisdiction allows this Court to exercise original jurisdiction over claims arising from federal law. 28 U.S.C. § 1331. Additionally, this Court has original jurisdiction over claims seeking "[t]o redress the deprivation, under color of any State law, . . . of any right, privilege or immunity secured by" federal law "providing for equal rights of citizens or of all persons within the jurisdiction." 28 U.S.C. § 1343(3). Lastly, this Court has original jurisdiction over claims seeking to "recover damages . . . providing for the protection of civil rights." 28 U.S.C. § 1343(4).

A district court may decline to exercise supplemental jurisdiction over state law claims if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). "When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims, or remanding them to state court if the action was removed." *Novak v. MetroHealth Med. Ctr*, 503 F.3d 572, 583 (6th Cir. 2007). Thus, because this Court has granted summary judgment in favor of Defendants and dismissed all claims of which it had original jurisdiction, the

Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims.

## CONCLUSION

Based on the above analysis, the Court **DENIES** Plaintiff's Motion for Summary Judgment (Doc. 121 & 122) in its entirety and **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion for Summary Judgment (Doc. 120). Thus, the Court orders the following:

(1) The Court **GRANTS** Defendants' Motion for Summary Judgment on Count 2 of Plaintiff's First Amended Complaint relating to Plaintiff's claim of disability discrimination in violation of the American with Disabilities Act. Thus, Count 2 is **DISMISSED WITH PREJUDICE**.

(2) The Court **GRANTS** Defendants' Motion for Summary Judgment on Count 3 of Plaintiff's First Amended Complaint relating to Plaintiff's claim of disability discrimination in violation of Ohio Rev. Code § 4112.01, *et seq*. Thus, Count 3 is **DISMISSED WITH PREJUDICE**.

(3) The Court **GRANTS** Defendants' Motion for Summary Judgment on Count 4 of Plaintiff's First Amended Complaint relating to Plaintiff's claim of gender-based pay discrimination in violation of the Equal Pay Act. Thus, Count 4 is **DISMISSED WITH PREJUDICE**.

(4) The Court **GRANTS** Defendants' Motion for Summary Judgment on Count 6 of Plaintiff's First Amended Complaint relating to Plaintiff's claim of gender-based pay discrimination in violation of the Ohio Rev. Code § 4111.17. Thus, Count 6 is **DISMISSED WITH PREJUDICE**.

(5) The Court **GRANTS** Defendants' Motion for Summary Judgment on Count 7 of Plaintiff's First Amended Complaint relating to Plaintiff's claim of retaliation in violation of the Family and Medical Leave Act. Thus, Count 7 is **DISMISSED WITH PREJUDICE**.

(6) The Court **GRANTS** Defendants' Motion for Summary Judgment on Count 11 of Plaintiff's First Amended Complaint relating to Plaintiff's claim of hostile work environment in violation of the Americans with Disabilities Act. Thus, Count 11 is **DISMISSED WITH PREJUDICE**.

(7) Because the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims, such claims are **DISMISSED WITHOUT PREJUDICE**.

Therefore, this case is **TERMINATED** from the Court's docket.

**IT IS SO ORDERED.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

By: _____
JUDGE MATTHEW W. McFARLAND